THE STATE v. PENNINGTON, *Appellant.*

Division Two, November 7, 1898.

1. **Insanity**: EVIDENCE : CRIMINAL LAW. In a trial for murder, the defense offered to prove that the defendant had been afflicted with epileptic fits, "not to show him insane at the time of the killing, but to account for his forgetfulness of the events immediately following." *Held* that the evidence was rightly excluded.

2. **Murder**: SELF-DEFENSE : INSTRUCTION. It is held that an instruction on self-defense, set out in the opinion, fully covered the law on this part of the case, and, therefore, no error was committed in refusing others asked by defendant on the same subject.

3. ———— : ———— : SELF-SEEKING : MANSLAUGHTER. This instruction was given: "If the defendant brought on the difficulty, or entered into it, *with the intention of killing or inflicting great personal injury upon deceased,* then the danger in which he found himself during such difficulty would not extenuate his offense or reduce its grade at all; but if he voluntarily brought it on or entered into it without any intent of killing or inflicting great personal injury upon deceased, and during such difficulty it became necessary for him to kill said Wilson to save himself from being killed or receiving great personal injury, then he can not be entirely excused on the ground of self-defense, but, in that case you should find him guilty of manslaughter in the fourth degree." *Held* that this instruction does not conflict with the law as announced in *State v. Partlow,* 90 Mo. 608, and *State v. Rapp,* 142 Mo. 443.

*Appeal from Morgan Circuit Court.*—HON. DORSEY W. SHACKLEFORD, Judge.

AFFIRMED.

*William Forman* and *Moore & Williams* for appellant.

(1) The giving of instructions for murder in the first degree was prejudicial to the defendant. There was no elements of that degree in this homicide and such an instruction is simply a statement of the court to the jury that the offense is more heinous than the law shows it to be and an invitation to the jury to punish the defendant severely. At the most, followed and threatened as was the defendant by the deceased, who was ready to strike at the moment with a deadly, open knife, the offense could be no more than manslaughter. (2) The fifth instruction given by the court which states that "if the defendant voluntarily brought on or entered into a difficulty with Wilson and during such difficulty killed Wilson, then he can not be acquitted on the grounds of self-defense," is not the law and this court has so decided. *State v. Rapp*, 142 Mo. 443; *State v. Partlow*, 90 Mo. 608. (3) The court was asked by the defendant in writing to instruct upon all the law applicable to this case as presented by the evidence. And while the court did give an instruction upon self-defense of a perfunctory sort and one that courts often give, yet in our judgment, defendant was entitled to a more specific and pointed instruction on the evidence in this case; or at any rate the court should have given instruction numbered two asked by the defendant. *State v. Hicks*, 27 Mo. 588. (4) The condition of mind of the defendant as a chronic epileptic was admissible as

explaining his strange conduct after the killing, given in evidence by the State, as admissions or confessions, over the objections of the defendant.

*Edward C. Crow*, Attorney-General, *Sam B. Jeffries*, Assistant Attorney-General, and *W. W. Graves*, for the State.

(1) There was ample evidence in the case to justify the court in giving instructions for murder in the first degree. (2) The defendant having been found guilty of murder in the second degree only, it is equivalent to an acquittal of the charge of murder in the first degree, and he can not therefore complain as to instructions upon murder in the first degree. *State v. Sansone*, 116 Mo. 1; *State v. Alfrey*, 124 Mo. 393. (3) Instruction number 5 properly states the law of the case. In it the law is stated as liberally for the defendant as the facts in the case will warrant. *State v. Partlow*, 90 Mo. 608; *State v. Talmage*, 107 Mo. 543; *State v. Paxton*, 126 Mo. 500; *State v. Lewis*, 118 Mo. 79. (*b*) The instruction conforms to the rule in the *Partlow* case and all subsequent cases, and in *State v. Rapp*, 142 Mo. 443, the court expressly reaffirms the doctrine of the *Partlow* case and other similar cases. (*c*) The instruction properly tells the jury, that if they find that the defendant brought on the difficulty without intent to kill or do great bodily harm, and after so bringing on the trouble, found it necessary to kill in order to save himself, the crime would be reduced to manslaughter. *State v. Parker*, 106 Mo. 217; *State v. Cable*, 117 Mo. 380. (4) (*a*) The defendant having disclaimed his right to make the defense of insanity, and denied his purpose to interpose that plea, the court properly excluded the evidence concerning the defendant having been previously and subsequently troubled with epileptic fits.

Such evidence was not competent and did not tend to prove any defense upon which the defendant was relying, or indicated his purpose to make. (*b*) The case of *State v. Stephens*, 96 Mo. 651, cited by appellant, has been so thoroughly criticised and overruled, that it can hardly be called an authority in the State at this time. *State v. Smith*, 114 Mo. 406.

GANTT, P. J.—The defendant appeals from a judgment, sentencing him to the penitentiary for twelve years for murder in the second degree. The indictment was preferred by a grand jury of Morgan county. The defendant was duly arraigned and tried at the April adjourned term, 1897. The homicide occurred at Proctor, a small village on the Osage river in Morgan county.

On the day of the general election, November 3, 1896, the defendant Pennington and the deceased Benjamin Wilson were both in the town of Proctor. About 8 o'clock in the night of that day they met in the store of Mr. Talbott. The evidence very conclusively establishes that Pennington began the difficulty by saying to Wilson, "You have been telling around that I have been bootlegging whiskey or selling whiskey." Wilson replied that he had not. Pennington repeated that he had. Wilson again said, "I have not been telling anything of the kind. It seems like you fellows have got it in for me this evening. I am not afraid of you," and asked Pennington "Where is your proof?" Pennington replied "William Irwin." Wilson asked, "Where is Irwin? Bring him here and I will prove to you that I did not tell him that." Pennington then said, "You are a liar. You are a G—d d—n liar. You are a G—d d—n son of a bitch, you are," and immediately began to shoot the deceased. He shot him four times; one bullet entered between the

fifth and sixth intercostal space, another entered under the arm in the axillary space, a third struck the tenth rib and a fourth went into the muscle of the arm. Death was almost instantaneous. The deceased made no resistance. He was wholly unarmed, save with an ordinary pocket knife, the long blade of which was perhaps two inches in length. It appears that just prior to the assault on him by defendant, the deceased had his knife in his hand, cutting a piece of bologna sausage which he was eating. This knife was found under him, with the large blade open, after his death.

After shooting the deceased four times defendant "broke" his revolver and threw out the exploded shells and reloaded it. He then started toward the door and accosted William Irwin and inquired if he had friends enough there to bury him. Irwin said, "I think you have," whereupon defendant said, "All right; I killed this poor innocent boy, and I want to die with him," and suiting his action to his words, he shot himself, but not seriously, we judge from the result. He then stepped out of the door and turned back, saying, "I want to go back and kiss that poor innocent boy that I have killed." He got down on his knees, leaned over and kissed the dead man.

There was evidence that a few minutes before the shooting, the deceased came into the store, passing near where defendant and one Moore were talking, and remarked in a quiet but general way that "Nobody could run sandies on him that way," apparently alluding to some conversation outside of the store. There was also testimony that on Sunday prior to the election, defendant had said that if Wilson, the deceased, had used the language that the defendant had heard, "he believed he would kill him."

The defense was self-defense. Defendant in his own behalf testified that he and deceased had several

conversations outside the store on different occasions
during the day of the homicide; that at the well de-
ceased said to him, "I have got it in for you;" that he
made this same speech that night, out on the porch of
the store, at which time defendant says he assured de-
ceased he never said he would hurt him.   He details
the occurrence in the store, in this way: "Mr. Wilson
came in again; and he walked up and got right in
front of me and the cut-off in the counter.   The cut-off
runs straight from the east door to the north wall of
the building.   There is a cut-off in the west counter.
What I mean is where you go behind the counter and
where you go out at the door, going between the coun-
ter.   And he turned round there to me.   On that there
was a word or two spoken; I disremember what it was;
and he turned round there and he looked me right in
the eyes and he says to me, 'I have got no friends here,'
but, he said, 'you can not run a sandy on me.'   Just
those very words is what he spoke, and, of course, I
disremember what the conversation was after that but
it occurred pretty shortly.. I disremember what it was.
And when he said that, when he says, 'you can't run
any sandy on me,' the best I remember, he had his
hand in his hip pocket, just this way.   And he pulled
his hand out of his hip pocket and stuck it in this
pocket."

Q.   "Coat pocket?"

A.   "Yes, sir; and then he kind of turned this
way, and he says again, 'I don't allow no damn man
to run a sandy on me,' and he drew the knife out of
his pocket in his hand.   There was a light on the west
counter, something near four feet in the gateway where
you go between the counter from the east to the west,
and that goes way on the other side that goes out on
the porch.   And this lamp was sitting over there some-
thing near three or four feet from the end of the

counter. Mr. Wilson was standing on the north side of me, and he threw himself in a position like this, with that knife in his hand; I could see the knife very plainly, because I saw the light reflect on it from that lamp on the west side of the stove; and when he threw that knife back that way, Mr. Powelson jumped in and says, 'Boys, I don't want no fighting in this house.' That is what Mr. Powelson said. And I saw the knife there, as he drew back this way, in a kind of position like this, and I saw him as he threw his hand back there. I saw the lick was coming from the knife. I was not more than three feet from him. Powelson caught me, and this other fellow caught him. And this other fellow was on the east side of Wilson. He was on the east side of him as he turned around, and I drew my pistol out of my hip pocket and shot him."

Q. "How rapidly did you shoot?" A. "Well, I could not state how fast it was." Q. "What kind of a revolver was it?" A. "It was a double action." Q. "Were you excited?" A. "Yes, sir; I was excited a little bit."

The defendant further testified: "I had no intention of shooting him before I saw the knife; the excitement was so high with me that I don't remember anything at all after the shooting occurred; I don't remember shooting myself; I felt the shock, but do not remember it; I do not remember talking with Mr. Irwin; don't remember when Mr. Thompson and Dr. Gibbs came; I think the knife blade was about two and one half or three inches long."

Henry Bicknell testified that on the day of the killing he was standing at the well in Talbott's barn yard with the deceased; that while there defendant passed by, and deceased remarked, "There is a s— of a b— that I have got it in for." He testified to hearing

Pennington tell deceased to go away from him, he was not looking for fights.

There was evidence that defendant's general reputation as a peaceable man was good and that deceased had a bad reputation in that regard.

The court instructed the jury in writing on murder in the first degree, second degree, and manslaughter in the fourth degree, self-defense, reasonable doubt, the presumption of innocence, and the good character of defendant. Defendant asked certain instructions which the court refused.

I.   This cause was well tried, and the exceptions are few.   One of the principal points urged for reversal is the exclusion of certain evidence tending to show that defendant, both before and after the killing, had been subject to epileptic fits.

To rightly understand the court's ruling on this point, we repeat what occurred on the trial in this connection. Counsel for defendant offered to prove by defendant himself, and his brother and a physician that defendant had been subject to epileptic fits before and since the killing. "We do not offer this to show him insane at the time of the killing, but to account for his forgetfulness of the events first following the killing." Thereupon the court ruled that "counsel having stated that a plea of insanity is not interposed in this case, and that the proposed evidence is only offered for the purpose of explaining the conduct of defendant, after the fatal shooting, the objections to it are sustained and the evidence excluded."

This action of the court is now assigned as error. Most clearly the court was right. After the declaration of counsel that the only purpose was to account for defendant's failure to remember the occurrence after the killing, it was not relevant to any issue in the case. The crime, if any, was then complete, and defendant

was not on trial for any subsequent conduct. Whether his memory was good or bad was utterly immaterial. Having waived the only defense to which evidence of his subsequent condition could have been relevant, it was properly excluded.

II.   The court gave the following instruction on self-defense: "If at the time the defendant shot the deceased he had good reason to believe and did believe that the deceased was about to immediately inflict upon him some great personal injury, and he shot him for the purpose of averting such apprehended injury, then you must acquit him on the ground of self-defense. In such case it is not necessary that the danger should have been real and about to fall.   All that is necessary is that defendant believed and had good reason to believe that such danger existed; on the other hand, it is not enough that the defendant believed in the existence of such danger, but he also must have had reasonable cause for so believing before he can be acquitted upon the ground of self-defense."

This instruction fully covered the law on this point and no error was committed in refusing others asked by defendant on the same subject.

III.   Among other instructions the trial court instructed the jury that:   "If the defendant brought on the difficulty, or entered into it *with the intention of killing, or inflicting great personal injury upon said Wilson*, then the danger in which he found himself during such difficulty would not extenuate his offense or reduce its grade at all; but if he voluntarily brought it on or entered into it without any intent of killing or inflicting great personal injury upon said Wilson, and during such difficulty it became necessary for him to kill said Wilson to save himself from being killed or receiving great personal injury, then he can not be entirely excused on the ground of self-defense, but in that

case you should find him guilty of manslaughter in the fourth degree."

Defendant insists this instruction has been condemned by this court in *State v. Partlow*, 90 Mo. 608, and *State v. Rapp*, 142 Mo. 443. We do not so understand those cases.

In *Partlow's* case this court held that the right of perfect or imperfect self-defense depended upon the intent with which the assailant brought on the quarrel. The doctrine as stated by Dr. Wharton (Wharton on Homicide, 197), that "the plea of provocation will not avail in any case where it appears that the provocation was sought for and induced by the act of the party in order to afford him a pretense for wreaking his malice; and it will presently be seen that even where there may have been previous struggling or blows, such plea can not be admitted where there is evidence of express malice, and it must appear therefore that when he did the act he acted upon such provocation, and not upon any old grudge," was expressly approved as law. And the rule as advanced by Bishop (2 Bish. Crim. Law, sec. 702) was adopted in these words: "If without provocation a man draws his sword upon another who draws in defense; whereupon they fight, and the first slays his adversary, his crime is murder. For he who seeks and brings on a quarrel can not in general avail himself of his own wrong in defense. But where an assault, which is neither intended nor calculated to kill, is returned by violence beyond what is proportionate to the aggression, the character of the combat is changed and if without time for his passion to cool, the assailant kills the other, he commits only manslaughter." The instruction was clearly drawn with reference to this view of the law.

In *State v. Rapp*, 142 Mo. 443, the instruction failed to note altogether the *intention with which the*

*assailant entered into the difficulty* and the case in its other features was dissimilar to the one now being considered.

IV.    It remains only to say there was no error in giving an instruction on murder in the first degree. There was cogent evidence that defendant had fully formed the design to kill deceased, and that he carried out his purpose in a heartless, cruel manner, without the slightest justification or provocation.    We are not surprised that remorse drove the defendant himself to admit that he had killed an innocent young man. Had the verdict been for murder in the first degree it would not have been disturbed.    Having patiently considered all the assignments, and found no error in the record, we affirm the judgment, and it is so ordered. SHERWOOD and BURGESS, JJ., concur.