# THE STATE v. McKENZIE, Appellant.

### Division Two, November 17, 1903.

1. **Criminal Law**: MURDER, SECOND DEGREE: PASSION: PROVOCATION. A homicide committed under the immediate influence of a passion which is produced by a just provocation, such as opprobrious epithets, insulting gestures, etc., is not committed in a cool state of the blood, and constitutes murder in the second degree.

2. ———: MANSLAUGHTER, FOURTH DEGREE: DEFINITION. Manslaughter in the fourth degree, under the statutes of this State, is the intentional killing of a human being in a heat of passion on a reasonable provocation, without malice and without premeditation, and under circumstances that will not render the killing justifiable or excusable homicide.

3. ———: ———: EVIDENCE: REDUCING KILLING TO MANSLAUGHTER. The testimony of defendant that deceased assaulted him, together with the statement of an eyewitness that he saw defendant and deceased engaged in a scuffle, is sufficient to reduce the killing to manslaughter.

4. ———: SELF-DEFENSE: INSTRUCTION. An instruction correctly states the law of self-defense which tells the jury that to justify the killing it is not sufficient that defendant may have acted upon an honest belief that danger was impending to his life, or that deceased was about to inflict great injury upon him, but that it must appear from the evidence that he had reasonable cause to apprehend danger, real and imminent, at the time of the killing, and that the jury are the judges of the reasonableness of his apprehension.

5. **Motion for New Trial**: NEWLY-DISCOVERED EVIDENCE: REQUISITES. In order to support a motion for a new trial on the ground of newly-discovered evidence, the party must show: first, that the evidence has come to his knowledge since the trial; second, that it was not owing to the want of due diligence that it did not come

sooner; third, that it is so material that it would probably produce a different result if the new trial were granted; fourth, that it is not merely cumulative; fifth, that the object of the testimony is not merely to impeach the character or credit of a witness; sixth, the affidavit of the witness himself should be produced, or its absence accounted for.

6. **Conflicting Evidence: PROVINCE OF JURY.** It is the province of the jury to pass upon the credibility of witnesses and the weight to be given to their testimony. And where the evidence, while conflicting, is sufficient to support a verdict, the appellate court will not interfere with the jury's finding.

Appeal from Boone Circuit Court.—*Hon. John A. Hockaday,* Judge.

AFFIRMED.

*J. L. Stephens* for appellant.

(1)   There is nothing in this case that warranted the instructions on manslaughter in the fourth degree. State v. Hopper, 71 Mo. 425; State v. Talbott, 73 Mo. 347; State v. Patterson, 71 Mo. 713; State v. Hersell, 97 Mo. 105; State v. Payton, 90 Mo. 220; State v. Turlington, 102 Mo. 642; State v. Brady, 87 Mo. 142; State v. Punshon, 124 Mo. 448; State v. Lewis, 118 Mo. 79. (2)   The instruction on self-defense erroneously cast the burden of proof on the defendant, and required him to absolutely establish his defense before the jury could acquit; and further mystified and misled the jury from a proper consideration of the defendant's instruction on self-defense. State v. Wingo, 66 Mo. 181; Nichols v. Winfry, 79 Mo. 544; State v. Hickam, 95 Mo. 322. The burden of proof was on the State throughout the whole case; it shifted to the defendant. This instruction reversed the universal rule; it practically assumed that the defendant was guilty, and prohibited the jury from acquitting unless they absolutely believed that the shooting was justified. This instruction is in conflict with the one given on self-defense for the defendant and

the jury were left to decide which one of these two instructions to follow. State v. Tatlow, 136 Mo. 678; State v. Luke, 104 Mo. 563. (3) The court erred in refusing to grant defendant a new trial upon the grounds of the newly-discovered evidence of Whitmore. If defendant had been given the advantage of this evidence upon a new trial, we think the result of the case would have been different. State v. Murry, 11 Mo. 95.

*Edward C. Crow*, Attorney-General, and *Sam. B. Jeffries*, Assistant Attorney-General, for the State.

(1.) There was ample evidence in the case to show violent passion suddenly aroused by reason of the deceased's having assaulted defendant with the knife. State v. Thomas, 78 Mo. 327. The provocation necessary to reduce from murder in the second degree to manslaughter in the fourth degree may consist of opprobrious epithets, insulting gestures and the like. State v. Bulling, 105 Mo. 204; State v. Thomas, 78 Mo. 327; State v. McKenzie, 102 Mo. 620. Reasonable provocation, such as a blow, will reduce a homicide to manslaughter. State v. Ellis, 74 Mo. 204; State v. Stephens, 96 Mo. 637; State v. Curtis, 70 Mo. 594; State v. Douglas, 81 Mo. 231. So also will the intentional killing of another without malice upon a sudden quarrel or in a heat of passion reduce the crime from murder to manslaughter. State v. Edwards, 70 Mo. 486. Defendant can not be consistent with the well-known rules of criminal law and say that where there is a heat of blood, caused by sufficient provocation, a sudden homicide, committed before the mind has time to act and realize the gravity of the offense, if not justifiable or excusable, is not manslaughter. State v. Bulling, 105 Mo. 204; State v. Starr, 38 Mo. 270. Where the evidence has the least tendency to show that the killing was intentionally done in a heat of passion caused by a blow, an instruction for manslaughter in

the fourth degree must be given. State v. Douglass, 81 Mo. 231; State v. Wilson, 98 Mo. 446; State v. Crabtree, 111 Mo. 136; State v. Herman, 117 Mo. 629; State v. Reed, 154 Mo. 122. (2) Instruction 5 tells the jury that unless they find from the evidence that defendant had reasonable ground to believe, and did believe, that the deceased was about to take his life or to do him some great bodily harm, and that the danger of his doing so was then and there imminent and impending; and that if they believed from the evidence that defendant could have, with safety to himself, avoided the shooting, they should find him guilty. The right of self-defense never arises until the accused has done all in his power to avoid the shooting or killing. State v. Kloss, 117 Mo. 592; State v. Lewis, 118 Mo. 79; State v. Johnson, 76 Mo. 121; State v. Cushenberry, 157 Mo. 168. There is no shifting of burden and no injustice done by the instruction in question. It properly presented the matter to the jury for determination. (3) The court instructed the jury that it is not sufficient that defendant may have acted upon an honest belief that danger was impending to his life or person, but it must appear from the evidence that he had reasonable cause to apprehend danger, real and imminent, at the time of the killing. This instruction has always been followed when the plea of self-defense was interposed. It is the law and can not be successfully contradicted. It is not sufficient that defendant thought he was in danger; he must have reasonable ground for so thinking. State v. O'Connor, 31 Mo. 389; State v. Duncan, 116 Mo. 296; State v. Eaton, 75 Mo. 586; State v. Brown, 63 Mo. 439; State v. Alley, 68 Mo. 124. The jury are the sole judges as to the time when the assaulted party may strike and the degree of force he may use to defend a violence and injury to himself. State v. Stockton, 61 Mo. 383.

FOX, J.—The indictment in this case charges the defendant with murder in the second degree for killing one John Hawkins at Boone county on the 19th day of February, 1901. The indictment was found by a grand jury at the June term, 1901, of the circuit court. Trial was had on the 20th day of June, 1901, which resulted in a hung jury. The defendant was then placed under a $1,500 bond and the cause continued until the following term. On the 9th day of June, 1902, a second trial was had which resulted in a verdict of manslaughter in the fourth degree and the punishment fixed at two years in the penitentiary. From this verdict, this appeal was taken.

The facts as detailed by defendant, the only witness on the part of the defense, as to what actually occurred at the time of the tragedy, are substantially as follows:

The defendant, J. R. McKenzie, lived in Centralia, Boone county, on the date the killing occurred, to-wit, on the 19th day of February, 1901; the deceased, John Hawkins, lived in Sturgeon. They had known each other for a long time. On the morning of the 19th day of February, 1901, defendant left Centralia on the 7 a. m. train for Columbia, to see Allen Arnold about renting a business house, located in Centralia; defendant on the night before and for some time had been sitting up with his sister-in-law during a spell of sickness. She lived in the suburbs some distance from where defendant lived, and having to return home very late in the night or early in the morning, he carried a revolver for his protection. And having returned from sitting up with his sister-in-law the night before, he overslept himself and hence was compelled to dress himself in a hurry for the train to Columbia, and in so doing forgot to leave the revolver, in fact, did not think of it being in his coat pocket and did not discover that he had the revolver until he had boarded the train. On the train he met the deceased, John Hawkins, who also came to Columbia. Defendant transacted his busi-

ness with Mr. Arnold and then met with the deceased, Hawkins. They participated in a game of poker, with other parties. It seems that McKenzie won a small amount of money and Hawkins wanted a division, and in order to avoid trouble McKenzie gave Hawkins $2.50, and said to Hawkins, "that is robbing me, John;" that Hawkins took offense at this remark. Both the defendant and deceased were somewhat drinking. That just before train time, which was 1:40 of the same day, they were in the Wayne saloon. Hawkins stepped out the back way and defendant left for the train; in a few minutes Hawkins came in and asked where McKenzie was, and William Smith, the bartender, a witness in the case, told Hawkins that McKenzie had gone to take the train. Whereupon Hawkins remarked that he would get the damn son of a bitch at Centralia. Both McKenzie and Hawkins left Columbia and arrived at Centralia on the same train at 2:20 p. m. They did not travel in the same car; in fact, McKenzie did not know that Hawkins was on the train until he saw Hawkins on the depot platform at Centralia. When McKenzie stepped out of the coach onto the platform to get off, he saw Hawkins near the southwest corner of the depot, and Hawkins motioned for McKenzie to come to him. McKenzie got off the train, walked west about a carlength and then turned north and went across the main track to the depot platform towards Hawkins; as McKenzie reached Hawkins, Hawkins turned to the side of McKenzie. They both walked north along the west end of the depot until they reached the northwest corner, which is the rear part of the depot, where Hawkins stopped and McKenzie turned facing him. Hawkins said to McKenzie: "Riley, damn you, did you say that I robbed you?" McKenzie replied: "Well, by God, John, I gave you $1.25 twice." Whereupon Hawkins said, "You are a damn liar," and made a thrust at McKenzie with a knife. That Hawkins continued to follow McKenzie, cutting at him all the time, having cut Mc-

Kenzie's coat sleeve in two places.   That soon as possible McKenzie drew his revolver from his pocket and fired, in all, four shots at Hawkins in rapid succession which shooting resulted in the death of Hawkins.   The second shot took effect in the lobe of the left ear below the ear, and entered the neck; the third shot took effect to the left and a little above the left nipple, ranging upward, and went through the chest wall; another wound was found on the hand—defendant does not know for certain but thinks that wound was made by the last shot. Two balls struck the depot building, one on the doorfacing over the door, about seven feet from the platform; the other ball struck the side of the building about ten or twelve feet above the platform.   After the fourth and last shot Hawkins rushed again at McKenzie and McKenzie pushed Hawkins and he fell off the platform. In a few seconds the deputy constable, the depot agent, Mr. Diggs, and others were at the scene of the tragedy. McKenzie had his revolver in his hand and delivered it to the officer, Jesse Irvin, and Elgin Cash, a small young man, picked up the open knife from the platform at the scene of the difficulty, which belonged to Hawkins, and handed same to Jesse Irvin.   George Bruce, who was also present, and who testified on the first trial of the cause, saw Cash pick the knife up and hand it to the deputy constable, Jesse Irvin, right at the scene of the tragedy.

The testimony on the part of the State tends to show that both defendant and deceased were drinking some on the day of the difficulty, and some of the testimony tends to show that deceased was very highly intoxicated.   It is further shown that defendant, while on the train going from Columbia to Centralia, exhibited his revolver, and made this statement relative to the deceased beating him out of some money.   Witness McBride testified as follows:

"Yes, sir; he was talking about John Hawkins
Vol 177 mo—45

owing him $2.25, as well as I remember that was the amount, that he had beat him out of that amount, as well as I remember, was what he said. They had been in a poker game together, I think, over here somewhere in town, but I don't know where, and that Hawkins beat him out of $2.25, I think was the amount. He said that Hawkins would be up to Centralia on the night train and he wanted to see him, and he wanted his money. He said, 'God damn it, I will see him when he comes up to-night on the train.'"

Witness Swinney, in a number of material particulars, contradicted the statements of the defendant. He, according to his testimony, saw a part of the tragedy and while it was going on he did not see any knife in the hands of the deceased. In fact, it is conceded by the appellant, that Swinney gives a different account of the tragedy to that related by the defendant. He testified in chief as follows:

"Q. Where do you live? A. In Centralia, Missouri. Q. How long have you lived there in Centralia? A. A little over seven years. Q. What is your occupation there? A. I work in a store. Q. In a feed store? A. Not now. Q. About the 19th day of February, 1901, where were you working? A. In a feed store, in Centralia. Q. You were working in a feed store in Centralia? A. Yes, sir. Q. About that date, February 19, 1901, in the afternoon of that day, what were you doing? What were you doing that day? A. I was hauling hay. Q. Where were you about the time the afternoon train from Centralia, from Columbia, I mean, got to Centralia that day? A. I was on a load of hay. Q. In what part of the town of Centralia were you at that time? A. On the north side of the railroad track. Q. How far from the railroad depot or station were you at that time? A. I don't know exactly how far I was from the depot, but I was, I suppose, about fifty or sixty feet further—I don't know. I didn't measure the distance, and I didn't see

anybody else measure it; I couldn't say.   Q.   That is your best judgment, that you were something like fifty or sixty feet from the railroad station or depot at the time the afternoon train came in from Columbia on the 19th day of February, 1901?   A.   Yes, sir, I suppose so, but I was on a load of hay at the time, and didn't pay any attention to that.   Q.   Which way were you going on that load of hay that day?   A.   I was going east.   Q.   What was between you and the depot, in the way of an obstruction, if anything?   A.   Nothing at all.   Q.   What did you see or hear while you were there sitting on your load of hay?   A.   I didn't hear anything at that time.   Q.   What were you doing?   A. I was just driving along.   Q.   What attracted your attention to anything that occurred there, if your attention was attracted to anything?   A.   I had a big load of hay on my wagon, and I had just one horse to draw it, and I was paying attention to my business, and didn't notice much of anything else. But I saw two men standing there talking.   Q.   Where were they standing talking?   A.   At the corner of the depot.   Q.   Who were those two men, if you know?   A.   I didn't know Mr. Hawkins at the time, but I knew Mr. McKenzie.   Q. You knew the defendant then?   A.   Yes, sir.   Q.   He was one of the men who was standing there talking, while you were on your load of hay?   A.   Yes, sir.   Q. What position were the two men in, if you remember? A.   Mr. McKenzie was on what is called the north side of the depot, at the corner, and the other man, who I didn't know then, but found out afterwards to be named Hawkins, he was east of McKenzie; and they were standing there talking to each other.   Q.   You afterwards found out who the other man was, you say, and that he was John Hawkins?   A.   Yes, sir.   Q. He was the man who was killed?   A.   Yes, sir.   Q.   They were about at the northwest corner of the depot, you say, standing there talking?   A.   Yes, sir.   Q.   What did they seem to be doing there, besides talking, if any-

thing? A. They were just standing there talking, as any other two men would be talking together; that is all I can say about it. Q. What did you next see, if anything, in regard to this case? A. I stood there, still on my wagon of hay, it was rough there and I started on, and my horse went five or six steps and then stopped, and I heard two or three pistol shots. I don't know what stopped the horse after going five or six steps, whether I pulled the line or not, but he stopped for some reason, and I looked round and saw Mr. Mc-Kenzie and Mr. Hawkins, or the man who I found out afterwards was Mr. Hawkins, there on the depot platform. Q. Was it the first two or three shots you heard then? A. Yes, sir, I heard the first shots. Q. Did you see those shots? A. No, sir. Q. When you looked round at that time what was Mr. Hawkins' position? A. He was about half way laying down. They were scuffling round there together, Mr. McKenzie and Mr. Hawkins were, and I could not see exactly what their positions were, or what they were doing, only they were scuffling round there, and that Mr. McKenzie was on the west side of Mr. Hawkins. Q. Which way was Mr. Hawkins facing at that time? A. He was facing north. Q. Directly north? A. Not exactly directly north, but pretty near directly north, as well as I can state it that was the way it was. Q. What was Mr. McKenzie's position while the shooting was taking place? A. It looked to me like he was in a kind of a stooping position. Q. How far was he from Mr. Hawkins when he was doing the shooting? A. I guess he was some three or four feet from him. Q. Which way was the pistol pointing? A. The pistol was pointed right towards Mr. Hawkins' head, it looked to me like, from where I was at. Q. How many shots did he fire at that time? A. He fired two shots then. Q. Then what took place, after he fired those two shots? What did either one of them do then? A. Mr. Hawkins got up then and went toward Mr. McKenzie,

and Mr. McKenzie pushed him—he was coming towards Mr. McKenzie this way (indicating), and Mr. McKenzie pushed him this way (indicating), and he fell off the platform?' Q. Who fell off the platform? A. Mr. Hawkins did. Q. Which way did he fall? A. He fell off of the north side of the platform. Q. How tall is the platform there? A. It is two or three feet high, I think, but I don't know exactly how tall it is, for I didn't measure it, or see it measured, and I didn't pay any attention to that. Q. State whether or not you know the position of those two men when the first two or three pistol shots were fired. You say you didn't see those shots fired, but that you heard them. Now, state, if you know, what position the two men were in at that time? A. I could not tell you that; I didn't see anything of that at all. Q. That shooting occurred in what county and State? A. It was in Boone county. Q. What State was it in? A. The State of Missouri. Q. What year was it? A. It was in 1891. Q. What month was it? A. February. Q. You said this shooting took place in the year 1891. Do you mean that, or was it 1901? A. Yes, sir, it was 1901. Q. February 19, 1901, was it? A. Yes, sir. Q. State what, if any, weapon you saw Mr. Hawkins have during that difficulty there? A. None; I didn't see any weapon at all that Mr. Hawkins had.''

Defendant admits the killing; he fired four shots. There is no evidence, except that by defendant, that the deceased had a knife in his hand during the entire difficulty. However, a knife was found on the ground near by, soon after the shooting. There was also testimony tending to show that the deceased was of a quarrelsome and dangerous character. There is some, but very slight, testimony reflecting on the character of the appellant.

Upon the testimony adduced, the court instructed the jury upon murder of the second degree, man-

slaughter of the fourth degree, and self-defense. Attention will be given the instructions in the progress of the opinion.

The first legal proposition attracting our attention is upon the contention of the appellant that the court erroneously submitted the question of defendant's guilt of manslaughter of the fourth degree. It is insisted, not that the instructions are improperly formed in phraseology, but that there was no testimony upon which to base the instructions for that grade of the offense. The instructions upon that particular grade of the crime were as follows:

"If the jury believe from the evidence beyond a reasonable doubt that the defendant, at the county of Boone and State of Missouri, on the 19th day of February, 1901, intentionally shot and killed John Hawkins, with a pistol, whilst in a violent passion suddenly aroused by reason of the said Hawkins having assaulted him with a knife, and that such shooting and killing was not done in self-defense, as defined in other instructions given, and was not done with malice, but was the result of such passion, then you will find the defendant guilty of manslaughter in the fourth degree and assess his punishment at imprisonment in the penitentiary for a term of two years, or by imprisonment in the county jail not less than six months, or by a fine of not less than five hundred dollars, or by both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months.

"If the jury believe from the evidence beyond a reasonable doubt that the defendant, on the 19th day of February, 1901, at the county of Boone, and State of Missouri, intentionally, with a pistol, shot and killed John Hawkins, whilst the said John Hawkins was assaulting him with a knife, and that the defendant in resisting such assault, used more force than was reasonably and apparently necessary to protect himself from death or great bodily harm, at the hands of said de-

ceased, then you will find him guilty of manslaughter in the fourth degree and assess his punishment at imprisonment in the penitentiary for two years, or by imprisonment in the county jail not less than six months, or by a fine of not less than five hundred dollars or by both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months.''

This court has very clearly given expression to its views upon the grades of homicide and has very pointedly drawn the distinction as to the heat of passion which reduces the homicide from murder in the first, to murder in the second degree, and from murder in the second degree to manslaughter.

Where a degree of passion is produced by what is termed a just provocation, such as opprobrious epithets, insulting gestures and the like, and a killing is done under its immediate influence it would not be done in a cool state of blood, and would fall in that grade of murder, of the second degree.

This court, in State v. Bulling, 105 Mo. 204, very aptly announces the rule. It is said in that case: ''The two phases or degrees of passion under our decisions referred to are: first, that passion which is produced by a *just* provocation, and, second, that passion which is produced by a *lawful* provocation. Opprobrious epithets, insulting gestures and the like are held to constitute just provocation in this State, and, where the passion or excitement of mind is produced by such provocation to the extent that it materially interferes with the judgment and reason, an act done *at once,* under its immediate influence, can not in law be said to be done deliberately, and the actor can not in law be said to be in a cool state of the blood. A homicide, committed under the influence of such passion, is not murder of the first, but murder of the second degree under our criminal code. This passion, thus produced, is a statutory concession to the frailty of human nature; but before it can

operate to mitigate a homicide from murder of the first, to murder of the second degree, the party acting under its influence must act *suddenly* and before he has time to reflect.''

In the same case is made clear the nature of provocation which reduces the homicide to manslaughter. The court, in further discussing that case, says, in speaking of the provocation necessary to arouse the heat of passion, which would result in reducing the crime to manslaughter: ''This court has held that 'legal,' 'lawful,' 'adequate' and 'reasonable,' when used as adjectives qualifying 'provocation,' are synonyms, and, as a general rule, with very few exceptions, it takes an assault or personal violence to constitute this provocation.''

This court has uniformly expressed its approval of the definition of manslaughter in the fourth degree as announced in State v. Hermann, 117 Mo. l. c. 637, where it said: ''Manslaughter in the fourth degree, under the statutes of this State, has often been defined by this court to be the intentional killing of a human being in a heat of passion on a reasonable provocation without malice, and without premeditation, and under circumstances that will not render the killing justifiable or excusable homicide.''

The propriety of the instructions upon manslaughter in the fourth degree must be determined by the facts upon which they purport to be based. We are of the opinion that the testimony in this cause warranted the submission of that grade of the offense to the jury. The testimony of the defendant is that the deceased assaulted him, and in addition to this is the statement of Swinney that when he saw them they were scuffling around there. This testimony was clearly sufficient to bring it within the rule of the cases heretofore referred to, that to reduce the grade of killing to manslaughter, the provocation must, with few exceptions consist of an assault or personal violence. As to the sufficiency of the provocation to arouse the heat of passion necessary

to reduce the offense to the grade of manslaughter, that was a question to be determined by the jury, from all the facts in the case.

The latter instruction complained of correctly declares the law. It, like the former, must depend upon the facts upon which it is based.

The testimony in this cause shows that defendant fired four shots at the deceased, and this instruction under discussion submitted to the jury the question as to whether the defendant under the testimony in the cause was warranted in using that amount of force to protect himself from reasonably apprehended danger. It was a question of fact for the jury to say whether, under all the facts, it was necessary for the defendant to use his pistol in the manner he did, and fire the four shots, as is shown by the testimony.

There was no error in giving the instructions by the court upon manslaughter in the fourth degree.

It is next insisted by appellant that the court committed error in giving instructions numbered 5 and 6, which are as follows:

"5. The court instructs the jury that they can not acquit the defendant on the ground of self-defense, unless they believe from the evidence in the case, on both sides, that defendant J. R. McKenzie had reasonable ground to believe, and did believe, that deceased, John Hawkins, was about, then and there, to take his (defendant's) life, or to do him some great bodily harm, and that the danger of his doing so was then and there imminent and impending; and in this connection the court further instructs the jury that if the defendant did not have reasonable cause to believe, and did not believe, that at the time and place of the shooting and killing, as set forth in the indictment, such danger was imminent and impending, and if they believe from the evidence that defendant could, with safety to himself, have avoided thus shooting and killing John Hawkins, at the time and by the means mentioned in the indict-

ment, he did such shooting and killing, but notwithstanding, he could, with safety to himself, have avoided such shooting and killing, he then and there willfully, feloniously, on purpose and of is malice aforethought, as heretofore defined in these instructions, with a pistol, as set forth in the indictment, shot and killed John Hawkins, you will find him guilty of murder in the second degree, and assess his punishment as hereinbefore provided.

"6.    The court instructs the jury that to justify the killing of John Hawkins by the defendant it is not sufficient that defendant may have acted upon an honest belief that danger was impending to his life, or that deceased was about to inflict great injury to defendant, but it must appear from the evidence that he had reasonable cause to apprehend danger, real and imminent, at the time of the killing, and the jurors herein are final judges of the reasonableness of his apprehensions."

To appreciate the necessity of instructions 5 and 6 for the State, it is essential that we examine instructions 5 and 7, given at the instance of appellant. They declare the law as follows:

"5.    The court instructs the jury that, when danger is thereatened and impending, a person is not compelled to stand with arms folded until it is too late to strike or shoot, but the law permits him to act on reasonable fear, and, in this case, if the defendant had reasonable cause to apprehend that Hawkins had a design to do him some great personal injury, and that there was reasonable cause to apprehend immediate danger of such design being accomplished, then McKenzie had a right to act on appearances and kill Hawkins to prevent such design being accomplished, and such killing would be justifiable, although it should afterwards turn out that the appearances of danger were false and unfounded, and the finding, in that case, should be for the defendant.

"7.    The court instructs the jury that if they be-

lieve and find from the evidence that the deceased, John Hawkins, sought and brought on the difficulty, and then and there assaulted the defendant, with a dangerous and deadly weapon, to-wit, a knife, giving him reasonable cause to believe that Hawkins was about to kill or do him great bodily harm, and that said assault was without just provocation, then defendant had a right to shoot and kill the deceased, in the necessary defense of his life, or to prevent any great bodily harm or injury, and their verdict should be for the defendant.''

It is fundamental that instructions must be construed together. It is apparent that the instructions here complained of are but qualifications of the instructions given at the instance of defendant. The usual and ordinary method, and, we think, the better one, of declaring the law of self-defense, is to incorporate in one instruction the entire subject-matter; but to separate the declarations of law, as applicable to self-defense, does not constitute error, if, taken together, they form, as a whole, a correct and harmonious announcement of the law on that subject.

It will be observed that the instructions given at the instance of defendant were without qualification, and there was no error in instructions numbered 5 and 6, which simply told the jury that the facts surrounding the defendant at the time of the fatal affray, must furnish the reasonable cause for his conduct, and not what his belief may have been as to the conditions surrounding him. His cause of apprehension should be reasonable and this must be determined from the evidence in the cause. Self-defense is emphatically one of necessity, and while a party assaulted is not compelled to retreat, yet if, with reasonable safety to himself, the killing of the aggressor can be avoided, it should be done.

The instructions do not undertake to shift a burden upon the defendant that the law does not place upon

him. They simply declare the law, as applicable to self-defense, and are in harmony with the repeated declarations of this court. [State v. Kloss, 117 Mo. 591; State v. Lewis, 118 Mo. 79; State v. Johnson, 76 Mo. 121; State v. Brown, 63 Mo. 439.]

This leads us to the contention that the motion for new trial should have been sustained, on the ground of newly-discovered evidence. Upon this contention, it will only be necessary to state the rule applicable to new trials upon newly-discovered evidence, and note the failure to particularly or even substantially comply with them.

This court, in State v. McLaughlin, 27 Mo. 112, in treating of that subject, said: "The court, therefore, to protect themselves from imposition, require such motions to be supported by the affidavit of the party, and the observance of other requisites, which are well stated in Berry v. State of Georgia, 10 Ga. 527, as follows: The party must show, first, that the evidence has come to his knowledge since the trial; second, that it was not owing to the want of due diligence that it did not come sooner; third, that it is so material that it would probably produce a different result if the new trial were granted; fourth, that it is not cumulative only; fifth, that the affidavit of the witness himself should be produced, or its absence accounted for; and, sixth, that the object of the testimony is not merely to impeach the character or credit of a witness."

This rule, as announced, has met the unqualified approval of this court, from that time to the present. [State v. Nettles, 153 Mo. 468; State v. Ray, 53 Mo. 345; State v. Musick, 101 Mo. 260; State v. Welsor, 117 Mo. 570; State v. McCullough, 171 Mo. 571.]

The newly-discovered evidence purports to be from witnesses Condict, Stewart and Whitmore. The record fails to disclose any affidavit of either Condict or Stewart. The affidavit of Whitmore is in the record, and so far as it is pertinent to this case, simply goes to

the impeachment of the witness for the State, McBride.

We have simply to apply the rule as herein quoted; by so doing it is apparent that but one conclusion can be reached, and that is, appellant has failed to bring himself within it, and there was no error in overruling his motion on that ground.

The last proposition insisted upon is that there is no evidence to support the verdict, and this cause should be reversed and defendant discharged.   Upon this proposition we will say that if defendant's account of this tragedy is to be given full credit, then, and in that event, this killing was clearly justifiable; but it must not be overlooked, under our form of trial, that the jury had the right to pass upon his testimony. They could believe or disbelieve him, accept or reject any part of his testimony.   They were the sole and exclusive judges of the credibility of the witnesses testifying in the cause, and of the weight to be attached to their testimony.   They had all the witnesses before them, doubtless observed their manner and conduct while testifying, and to disturb this verdict, on that ground alone, would simply be usurping the province of the jury, and be converting this court into the triers of the fact. This we are unwilling to do.   While this court will not hesitate in setting aside a verdict where the evidence is not sufficient to support it, yet it will not undertake to re-try the questions of fact, which have been fairly passed upon by the jury.

We have read with care this entire record, and, as indicated by the instructions, the learned trial judge, very favorably to the defendant, submitted this cause to the jury, and, finding no reversible error, the judgment will be affirmed.

All concur, except *Burgess, J.*, absent.