State v. Williams.

---

## THE STATE v. WILLIAMS, Appellant.

### Division Two, January 31, 1905.

1. **MURDER: Conflicting Evidence: Province of Jury.** Where the evidence is conflicting, it is for the jury, who are the triers of the facts, and the judges of the weight of the evidence and the credibility of the witnesses, to credit or reject the testimony as they see fit. And if there is evidence which would make the homicide murder in the first degree, murder in the second degree, or a killing in self-defense, the court properly submits all these questions to the jury, leaving it to them to determine the degree of defendant's guilt.

2. ———: **First Degree.** The evidence in this case is examined and held sufficient to justify the verdict of the jury finding defendant guilty of murder in the first degree.

3. **WITNESS: Improper Question: Not Answered.** Where a witness is asked an improper question, and answers merely that he does not know, no harm is done defendant by the asking of the question.

4. ———: **Cross-Examination of Defendant.** A cross-examination of defendant which is restricted to the subject of his examination in chief is a compliance with the statute on that subject.

5. **APPELLATE PRACTICE: Points Not Preserved in Bill of Exceptions.** Matters not preserved in the bill of exceptions, unless a part of the record proper, can not be considered by the appellate court. The mere raising of such matters in the motion for new trial proves nothing.

Appeal from St. Louis City Circuit Court.—*Hon. Jesse A. McDonald*, Judge.

AFFIRMED.

*Edward C. Crow,* Attorney-General, and *C. D. Corum,* for the State.

(1) There was substantial evidence tending to show that the defendant murdered the deceased. On the other hand, there is evidence that would have amply warranted the jury in acquitting the defendant on the ground of self-defense. If defendant's account of the tragedy, and that of his witnesses, should be given full credit, then the killing was justifiable. But the jury were the judges of the credibility of the witnesses, and of the weight to be attached to their testimony. There was substantial evidence tending to show the defendant guilty of the crime of which he was convicted, and in such cases this court will not interfere. State v. McKenzie, 177 Mo. 717. (2) Defendant was not harmed by the answer of a witness that she "did not know," even if it be conceded that the question sought to elicit information that was not within the knowledge of the witness, and its admission did not constitute error. (3) The examination of defendant was confined to the "subject of the examination in chief," and was, therefore, proper. Our statute permits an examination of the defendant about "any matter referred to in his examination in chief." R. S. 1899, sec. 2637; State v. Avery, 113 Mo. 475; State v. McLaughlin, 149 Mo. 19; State v. Fisher, 162 Mo. 169. (4) Defendant complains because of an alleged statement made by the circuit attorney that the defendant was guilty of the foulest murder ever committed; but the bill of exceptions does not show that any such statement was made. The statement in the motion for a new trial proves nothing. State v. Williams, 147 Mo. 14.

GANTT, J.—This is an appeal from a sentence by the circuit court of the city of St. Louis. The de-

fendant was indicted on the third day of November, 1903, for the murder of Luther Lewis in said city on the evening of August 3, 1903. The deceased and defendant were negro men and the scene of the homicide was a section locally known as "Bad Land Alley" between Lucas and Morgan streets and Thirteenth and Fourteenth streets in St. Louis.

On the night of the homicide and for some eight months prior thereto, the defendant made his home at the residence of Dora Booker, also a negress, at 1323 1-2 Linden street in said city. He was cohabiting with a daughter of Dora Booker, Paulina, under the guise of a common-law marriage.

The deceased also lodged in that neighborhood during that summer. He had worked on the boats on the river and was in the habit of loafing in the vicinity in the afternoon and evenings after working.

On the evening of August 3, 1903, the Booker family and others of their negro friends, including Luther Lewis, were sitting in front of the Booker home, 1323 1-2 Linden street, singing plantation melodies and drinking beer. The defendant had been for some time and was that day employed at Scullin & Gallagher's Iron Works. He had returned to the Booker residence just before the usual supper time and after washing himself had gone out and returned and ate his supper.

He then left again and an hour or two later came back with three companions and went inside of the house and played cards for awhile and then they all left again.

After they left, the deceased came to the Booker residence and sat down with the family. He sat next to Paulina. Her sister Marie and her brother were in the immediate neighborhood and the mother, Dora, either stood or sat in the front door. While this party were thus located, singing and enjoying themselves, the defendant and several companions returned to this

narrow street or alley and approached the Booker house. Almost immediately upon reaching the scene, the defendant walked up to the different members of the party and looked into their faces until he came to Luther Lewis. Standing before Luther, he said to him, "Luther, what you doing setting here talking to my woman?" to which deceased responded, "I wasn't talking to your woman, I was singing." Thereupon Marie Booker spoke up and said, "Fred, don't start no fuss here in front of mama's door," and defendant said, "I ain't fussing, I am only talking." At this point the mother, Dora Booker, got up and told Luther to get up and go into Queenie's, the next house to her's. Dora Booker testified she did this because she thought defendant was going to start a racket there. She told Luther to go into Queenie's because she had noticed he stopped there before this time. She testified defendant was intoxicated at the time and she knew he had a pistol. Luther was sober.

Defendant further inquired what Luther had said, and Luther told him what he had said didn't concern him and went up to defendant and placed his hand on his shoulder, whereupon defendant asked him what he had in his hand, and Luther said, "I ain't got even a cigarette paper." All the witnesses agree that deceased was at this time in his shirt sleeves. Immediately after deceased put his hand on defendant's shoulder, defendant began to pull a revolver out of his pants pocket and to back a step or two. At first the pistol caught in his pocket and Dora Booker stepped to defendant's side and continued to remonstrate with defendant and at the same time to urge the deceased to go into Queenie's. Defendant having disengaged his revolver began at once to fire at deceased. After the first shot deceased turned and ran across the alley. The defendant fired four shots at him, the last as he entered the door of Emma Steward's house, on the opposite side of the alley. Two of these shots

struck deceased and one inflicted a mortal wound from which he died next day at the city hospital. One bullet went through the thigh of deceased; the other entered the left groin, ranged upward, passed through the belly, cutting the intestines five times, and lodged on the other side. The police officer Callahan testified he heard the shooting and ran at once to the scene of the homicide and found deceased in Steward's house groaning and crying and examined his person and found no weapon of any kind on him. That something was said about his having a knife, but he had no knife on his person or about him. Immediately after the shooting, the defendant fled and was apprehended at Newport on the Illinois side of the river on the fifth of August, 1903. He caught the defendant after chasing him down to the levee. When arrested, he was told that he was arrested for killing Luther Lewis and expressed surprise that he had killed him. He didn't think he had shot him seriously, but said he had shot him. There was an attempt to show deceased was of a turbulent, dangerous character, but the officer of that beat testified he had never known him to be in a difficulty, but had seen him intoxicated several times. The defendant was shown to have been an industrious man.

On the part of defendant, Paulina Booker testified that as she sat by deceased that evening in front of her mother's house, they were all singing and when defendant came into the alley just prior to the shooting of deceased, deceased said to some man, who was with him, "Here comes the s— of a b— now, and when I get through with him he will have a plenty." And she spoke up and said, "What's the matter Luther, are you in trouble?" and he said, "No," and she said, "There ain't any use in raising trouble," and he said, "That's my business; any time I get in trouble with anybody I never get caught up with," and by that time Fred came up and said, "What's that you said,"

and Luther answered, "It's none of your business, it didn't concern you." Defendant again asked him, "What's the matter?" and he again told him it was none of his business.

She says at this point she stepped into the house to call Fred and tell him Luther had a white handled knife and when Fred started into the house Luther jumped in between him and the door and her mother called to Luther to go into Queenie's and not to have any trouble, but Luther stood between defendant and the door and defendant couldn't get into the door, and deceased was rushing upon defendant and defendant asked him what he had in his hand, and deceased made no answer, and at this point, Jim Meek, another negro, handed defendant a revolver and defendant shot deceased.

She testified Fred was not intoxicated. She testified she didn't know whether deceased referred to defendant when he said, "Here he comes now, and when I get through with him he will have enough." Luther was still sitting down when defendant came up. She also testified that when Fred, the defendant, was coming up the alley, she saw deceased take his knife out and open it and stick it in his right sleeve. He was in his shirt sleeves. He went across the alley and got it from Brock. She ran after the first shot and didn't see the remainder of the difficulty.

Her evidence was supported by another negro woman as to the remark, "Here he comes now, and when I get through with him he will have enough," and to the fact that deceased opened the knife and put it up his sleeve and that deceased was approaching defendant when defendant shot him. She testified that deceased had a good reputation for peaceable or orderly conduct.

She testified Paulina called defendant into the house and told him not to start a fuss; that Dora

Booker went out to Fred and that she told deceased to go into Queenie's house.

In his own behalf, defendant testified to a gambling transaction with deceased a few days prior to the difficulty, over on Morgan street, in which deceased lost, and tried to borrow some money from him, and he told him he wasn't loaning or giving any money that day. Whereupon deceased said, "What would you think if I took it away from you?" and he answered, "No, you wouldn't do that," and deceased started to him, but seeing officer Callahan desisted, but said, "Never mind, I'll get you when you ain't studying." That he never saw him any more until the night of the shooting. When he approached the crowd, he says deceased said, "Here's the black bastard now." "Black s— of a b—," at least, and I wasn't thinking about any squabble or nothing like that and I walked up and put one hand on the chair and leaned over and I says, "What did you say?" and he says, "Come around here and I will tell you," and I moved one chair back and started around between the chairs to where he was— he had done stood up then—to see what he was going to say and Paulina says, "You come in the house, Fred." "You are fixing to get hurt out there and don't know it." And rather than go to him, I turned from him and come round the same chair to go in the door and he (deceased) gets up and steps on the east side of the door and I gets mighty near the door and he reached at me like that and he just did touch me on the shoulder and I seen the knife up his sleeve and the blade of it sticking out like that and jumped back from him and I says, "What's the matter with you?" "What have I done to you?" "What are you mad at me about?" He said, "I want to talk to you," and I says, "What you want to talk to me about with a knife in your hand?" "Are you drunk?" and the old lady she says, "Fred, go in the house and Luther, you go down that way and don't start no fuss." I started

to the door to go in the house and when I started the second time he started rushing for me and I was backing and Jim Meeks handed me a gun in my hand. I didn't have anything in my hand before he handed me the gun and I knowed full and well if he got close to me he would hurt me and I knowed he was sly and when Meeks handed me the gun I fired three shots right there and I turns down the alley and he comes and starts toward me and I fired another shot and then I run down the alley to "Pig Tail Alley," and I run and threw the gun over the fence and run over to Washington avenue. Other facts may be noted in the course of the opinion as well as the instructions.

I. From the accompanying summary of the testimony, it is evident that there was an irreconcilable conflict between the case made by the State's witnesses and that on behalf of defendant. The defendant is not represented by counsel in this court, but, in obedience to the statute, we have carefully read the entire transcript and made the defendant's motion for a new trial in the circuit court the basis for the consideration of the errors therein alleged.

While there was a large number of witnesses, their testimony was directed by both sides to the immediate circumstances preceding and attending the tragedy. If the witnesses for the State are to be believed, and they were by the jury, then we have the case of a young negro man enjoying the companionship of his friends on a summer's night, indulging in singing in the open air, a pastime of which his race have ever been passionately fond. At intervals they drank beer. All the witnesses, both for the State and defendant, concur in saying that up to the appearance of defendant and his companions just prior to the homicide, there was no discord in the gathering in front of Dora Booker's door. Of the family the defendant was a recognized member. No trace of ill-feeling was disclosed between defendant and Dora Booker and her other daughter and son

and the defendant, and no evidence of any marital troubles between Paulina, the daughter with whom he was cohabiting, and himself.

In the story told by Dora Booker, Isham, her son, and Marie, her daughter, there was no appearance of dislike or unfriendliness to the defendant. Their evidence was strongly corroborated by several other eye-witnesses. Accepting their account of what immediately preceded the shooting of deceased by defendant, it is clear deceased was doing nothing and saying nothing tending to a breach of peace. They sat in a few feet of him and were so situated as to be able to see and hear all that he said or did. While he and the other young men and women were singing, the defendant appeared with some companions on the scene. Without any provocation, verbal or otherwise, the defendant at once accosted the deceased with a demand to know what he was doing there sitting talking to his woman, to which deceased replied, "He was not talking to her, but he was singing." Something in the manner of defendant obviously impressed both Dora Booker, the mother, and her daughter, Marie, that defendant was in an ugly mood, because they each at once told defendant not to start a row there, and it is plain that Dora Booker considered the deceased was the one with whom defendant was likely to become embroiled in a difficulty from the fact that she immediately arose and directed the deceased to go into the next house and began to remonstrate with defendant for starting "a fuss."

It appears also that deceased endeavored to pacify the defendant and approached him in a friendly manner and demonstrated that he had nothing in his hand, but the defendant, armed with a deadly revolver and deaf to all peaceful overtures, began to draw his pistol and as soon as it was free from his pocket began to fire upon the deceased who was unarmed and unoffending and attempting to avoid him. He shot at

him twice at close range and continued to shoot after deceased had fled across the narrow street and as he was entering Steward's house on the opposite side. Under these circumstances the killing was murder in the first degree. On the other hand, if the deceased, in the presence and hearing of the defendant, called him a "black bastard" or "black son of a bitch," and the defendant, smarting under the insult and the passion aroused thereby, instantly, without any lawful provocation, such as a blow or other personal indignity, intentionally and premeditatedly, with a deadly weapon, shot and killed deceased, then the killing of deceased was murder in the second degree. [State v. Wieners, 66 Mo. 13; State v. Chas. Ellis, 74 Mo. l. c. 218-219; State v. Robinson, 73 Mo. 306; State v. McKenzie, 177 Mo. 699.]

As there was evidence to support either view, the court properly submitted both grades of murder to the jury. That there was abundant evidence which justified the jury in refusing to believe that the deceased used either of the opprobrious and insulting epithets to defendant, is too plain for discussion.

The court properly gave a very liberal instruction on the right of self-defense. If the testimony of Paulina Booker, Carrie Bell, and the defendant himself and perhaps others is to be credited, as it was not by the jury, the deceased had made a serious threat against defendant, and in addition to the insulting epithets had opened his knife and concealed it in his sleeve and was rushing upon defendant, who discovered the knife, and defendant shot to protect himself from a murderous assault.

If under these circumstances he killed the deceased clearly he was guilty of no grade of homicide or crime whatever, but was simply exercising his unquestionable right of self-defense. This was a question of fact and the jury who heard and saw all the witnesses rejected this evidence, and it was their province to do

so, and in such a case this court will not interfere with the jury's finding. [State v. McKenzie, 177 Mo. 699.] The foregoing observations dispose of the first five grounds of the motion for a new trial.

II. As to the error assigned in the admission of evidence, a careful reading will show that no error was committed in this respect. In fact, only twice in the course of the trial was the point made. In the first place, while the question was permitted, the witness answered she didn't know, so that nothing harmful was elicited and clearly no prejudice resulted. The cross-examination of defendant did not offend the statute on that subject. The defendant in his testimony covered the whole ground and the cross-examination was entirely legitimate, confined as it was to the subject of his examination in chief. [State v. Avery, 113 Mo. 475; State v. Fisher, 162 Mo. 169.] As to the seventh ground, it need only be stated there was no evidence rejected on the part of defendant.

III. The eighth ground for a new trial is that the circuit attorney in his argument stated that "the defendant was guilty of the foulest murder ever committed," but the bill of exceptions nowhere confirms this assignment, and the mere charge in the motion for new trial of course proves nothing. [State v. Williams, 147 Mo. 14.]

IV. A kindred ground is that one of the jurors on his *voir dire* stated he did not know any of the witnesses, whereas in fact he was acquainted with one witness for the State. Without conceding for one moment that this if true constituted a ground of challenge, it suffices to say that there is absolutely nothing in the record to show the juror made such a statement nor that it was shown that he in fact did know one of the witnesses.

V. Complaint is made that the assistant prosecuting attorney misstated the law as to the right of im-

peachment of defendant. We have examined the record carefully on this point and find no ruling by the court and no exception taking to its ruling or failure to rule. It is clear that the matter is not before us for review under the repeated rulings of this court.

VI. The instructions defined murder in the first and second degree and were such as have often met our approval.

The instruction on self-defense was full and favorable to defendant. The court instructed on the presumption of innocence, reasonable doubt, the credibility of witnesses, flight as a circumstance to be considered, threats by deceased in connection with the evidence that he was of a quarrelsome and dangerous disposition, and the good character of defendant and the competency of defendant as a witness in his own behalf. The only objection made to them was that they did not amply cover all phases of the case. We think they did, and were unobjectionable in any view of the facts that could be taken.

We have thus, without the aid of argument or brief on behalf of defendant, patiently reviewed the record in this case and are driven to the conclusion that the defendant is guilty of the crime charged and that he was accorded a fair and impartial trial, and the sentence and judgment of the circuit court is affirmed, and we direct that the sentence which the law imposes be executed.

All concur.