THE STATE v. BAILEY, Appellant.

Division Two, July 3, 1905.

1. **MURDER: Information: Charge of Inflicting Wound.** The information charged: "And a certain revolving pistol, which was then and there loaded with gunpowder and leaden bullets and by them, the said Edgar G. Bailey, James Forsha and William Moon, in their hands then and there held, did then and there feloniously, wilfully, premeditatedly, on purpose and of their malice aforethought discharge and shoot off, at, upon and against him, the said Albert Ferguson, and him, the said Albert Ferguson, with the leaden bullets aforesaid, out of the pistol aforesaid then and there by force of the gunpowder aforesaid by the said Edgar G. Bailey, James Forsha and William Moon shot off and discharged as aforesaid, then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of their malice afore-

thought did strike, penetrate and wound, the said Albert Ferguson, in and upon the body of him, the said Albert Ferguson, thus and thereby, then and there, etc., giving to him, the said Albert Ferguson, with the leaden bullets aforesaid so as aforesaid discharged and shot off out of the pistol aforesaid by the said Albert G. Bailey, James Forsha and William Moon, one mortal wound." *Held,* that this information charges the defendants with having inflicted upon the deceased the wound of which he died.

2. ———: ———: Venue. Where the information in the beginning lays the venue in a certain county, and the affidavit is taken and certified by the clerk of the criminal court of that county, the information is not insufficient because the clerk does not repeat the venue in the verification. The presumption of law is that the clerk took and certified the affidavit within the territorial bounds in which he was authorized to administer oaths, even though he did not give a venue to the affidavit further than to subscribe his name as the clerk of the criminal court of that county.

3. PRACTICE: Saving Exceptions: Motion. Defendant's counsel at the beginning of the trial filed a motion to permit and allow exceptions to all adverse rulings on objections interposed by the defendant, on the trial, without announcing such exceptions to the court at the time, on the ground that the exceptions if saved at the time would create in the minds of the jurors prejudice against defendant; and it is alleged that the motion was in harmony with the practice in the trial of civil cases in the same city. *Held,* that the overruling of this motion was not error.

4. ———: New Witnesses: Notice. The prosecuting attorney, before any witness was sworn in the case, furnished defendant's counsel with a list of additional witnesses, all of whom were easily accessible to defendant, and he made no request for a continuance or time to investigate. *Held,* that the judgment can not be reversed because these witnesses were permitted to testify without their names being indorsed on the information.

5. MURDER: Proof of Other Crimes: Competency: Strike. A strike being on between union and non-union hack-drivers, the defendants belonging to the union and the deceased not, it was not error to permit the State to prove that on the same night and prior to the killing of deceased, the same defendants had called up by telephone another non-union hack-driver and directed him to take them to a road house in another part of the city and while there forcibly and feloniously had assaulted and taken from him the revolver with which appellant later in the night killed deceased, after calling him up in the same way and having him to drive them to another part of the city, for five reasons: *first,* it was entirely competent for the State to show that the pistol was the property of another non-union hack-

driver, and the circumstances under which appellant obtained it; *second*, the evidence tended to identify defendant; *third*, it tended to show the intent with which appellant killed deceased, and as he is charged with deliberate and intentional murder, it devolved on the State to show the intent; *fourth*, it tended to show motive, and as it also devolved upon the State to show the circumstances tending to prove deliberation and motive, it was competent for that purpose; *fifth*, it tended to show that the assault upon deceased was a part of a common scheme to insure the success of the hack-drivers' strike, by resorting to acts of violence and felonious assault upon non-union men, in order to intimidate and terrorize the owners of hacks into refusing to employ non-union drivers.

6. ———: **Statement by Defendant: After Homicide.** The defendant and his associates had been active in behalf of strikers, and the day after defendant had shot a non-union driver, a citizen remarked in defendant's presence that the union hack-drivers could never expect to win a strike by shooting people, and to that defendant replied: "That was the only way to win; they ought all to be killed." *Held*, that this voluntary statement was competent evidence to establish motive and intent.

7. ———: **Instruction: Modifying Clause.** The court told the jury that "if the defendant voluntarily brought on the difficulty with deceased, or voluntarily entered into a difficulty with deceased, with the intent of killing or inflicting upon him some great bodily injury," etc. *Held*, that this last clause modifies both the preceding ones, and not simply the second.

8. ———: ———: **Self-Defense: Manslaughter.** Where the theory of the homicide presented by the State is that defendant and his companions, active in a hack-drivers' strike, brought on the difficulty with the felonious intent of beating up deceased, a non-union driver, in order that they might have an excuse for killing him, and that of defendant is that they called deceased in order that they might have an innocent hack-drive at three o'clock at night in a lonely residence portion of the city, and that deceased made an entirely unprovoked assault upon them and that they killed him, as a last resort, in self-defense, there is no room in the case for an instruction for manslaughter.

9. ———: ———: **Accomplice.** Where the only evidence that a witness was an accomplice was her own, and according to it she did not join in the common purpose of her three male companions but protested against it and only accompanied them in response to their demands, it is not proper to give a cautionary instruction as to her testimony.

10. ———: ———: **Defining Words Used.** It is not necessary for the court to define the words "bring on the difficulty."

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford*, Judge.

AFFIRMED.

*Williamson & Brooker* for appellant; *W. F. Riggs* and *I. B. Kimbrell* of counsel.

(1) All of the evidence concerning Bailey's relations with the Biggs woman, concerning the difficulties with other men previous to the shooting, and concerning Bailey's statements in regard to the proper management of the strike, was incompetent and the court erred in admitting it. 1 Bish. New Cr. Proc. (4 Ed.), sec. 1120; State v. Spray, 174 Mo. 569. (2) One who merely brings on a difficulty, without felonious intent, is not deprived of the right of self-defense, and instruction 4 is erroneous because it states the law to be to the contrary. State v. Partlow, 90 Mo. 608; State v. Rapp, 142 Mo. 443; State v. Higgerson, 157 Mo. 395; State v. Garrett, 170 Mo. 395; Kaw Brick Co. v. Hogsett, 82 Mo. App. 47. (3) Defendant had at least an imperfect right of self-defense, and the jury should have been so instructed. Instruction 4 is erroneous because instructing the jury to the contrary. State v. Patterson, 159 Mo. 562; State v. Cable, 117 Mo. 385; State v. Partlow, 90 Mo. 385; State v. Lockett, 168 Mo. 498; State v. Brown, 104 Mo. 373.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1) The fact that in the information the "wounding" could have been pleaded differently does not make the language used insufficient, if the indictment charges the defendant, with reasonable clearness, with the infliction of the wounds upon deceased from which he died. The verification to the information is accord-

ing to the form contained in section 2479, Revised Statutes 1899. In addition, the venue is shown by the information itself. The misspelling of words or the use of ungrammatical language will not vitiate an indictment or information. State v. Vaughan, 141 Mo. 514; State v. Miller, 156 Mo. 76; State v. Pfenninger, 76 Mo. App. 313. (2) Section 727, Revised Statutes 1899, requires that exception to adverse rulings of the court shall be made "in the progress of the trial." Kelley, Criminal Law, p. 230. The conduct of a trial is a matter peculiarly within the discretion of the trial court. (3) It does not appear that after the attorneys for defendant received a supplemental list of witnesses they either asked for a continuance or asked for time in which to investigate concerning these additional witnesses. No error was committed by the court in its ruling in this regard. State v. Nettles, 153 Mo. 469; R. S. 1899, sec. 2517. (4) In view of the defense in this case, the jury would have been absolutely incapable of knowing the truth as to the homicide without being informed as to where Bailey got the pistol with which he killed Ferguson, and also the common scheme that he and his associates were pursuing in reference to assault committed upon non-union hack drivers. State v. Mathews, 98 Mo. 129; State v. Jones, 171 Mo. 407; State v. Scott, 172 Mo. 542; State v. Spray, 174 Mo. 576; State v. Schnettler, 181 Mo. 189; State v. Collins, 181 Mo. 259; State v. Rudolph, 85 S. W. 584; State v. Greenwade, 72 Mo. 300; State v. Grant, 79 Mo. 137. (5) Voluntary statements and admissions of the defendant, concerning the offense charged, are always admissible against him if they are explanatory of the crime which it is contended the defendant committed. State v. Jackson, 95 Mo. 651; State v. Woodward, 182 Mo. 391. (6) There is no difficulty in reconciling instruction 11, given for defendant, with instruction 4 given in behalf of the State. The question of the intention of Bailey as to inflicting great bodily

harm upon Ferguson, or an absence of such intention, determines the application of either instruction 4 or instruction 11 to the facts of this case. Under Bailey's testimony, he shot in self-defense, and under the State's testimony, he had Ferguson drive to Fifteenth and Central in order that he, defendant, might inflict upon Ferguson death or great bodily harm. There was no consistent middle ground in the entire case upon which to base instruction 14 requested by defendant; and he certainly received all to which he was entitled in instruction 11, given at his request. (7) The court was not called upon to define the terms "self-defense" and "bringing on the difficulty," as applicable to this case, for the reason that these terms are self-explanatory. But even if these terms should have been defined by the court, no request of the court was made by the defendant to instruct concerning those terms, and no exception saved on account of the failure of the court to instruct thereon. Consequently, that question is not now before this court for review. State v. Meadows, 156 Mo. 110; State v. Weakley, 178 Mo. 413; State v. Vinso, 171 Mo. 591; State v. Gregory, 178 Mo. 49; State v. Sharp, 183 Mo. 716. It was proper for the court to give an instruction for murder in the first degree, murder in the second degree and self-defense; but there was clearly no manslaughter in the fourth degree shown by the evidence either for the State or for the defendant. State v. Gartrell, 171 Mo. 522.

GANTT, J.—On the 19th of April, 1904, there was filed in the criminal court of Jackson county, by the prosecuting attorney of said county, an information charging the defendant, Edgar G. Bailey, James Forsha and William Moon, jointly with the murder in the first degree of Albert Ferguson by shooting him with a pistol, on the 19th day of March, 1904, in said Jackson county. Upon the application of the defendants, a severance was granted, and the State elected

to try Edgar G. Bailey first. The trial began on the 27th of June and ended on the 21st of July, 1904, and resulted in a conviction of defendant Bailey of murder in the first degree. From that conviction he has appealed to this court.

The information is as follows:

"State of Missouri, County of Jackson.  ss.

"In the Criminal Court of Jackson County, Missouri, at Kansas City, Missouri, April Term, A. D., 1904.

"Now comes Roland Hughes, prosecuting attorney for the State of Missouri, in and for the body of the county of Jackson, and upon his official oath informs the court, that Edgar G. Bailey, James Forsha and William Moon, late of the county aforesaid, on the 19th day of March, 1904, at the county of Jackson, State of Missouri, in and upon one Albert Ferguson then and there being, feloniously, wilfully, deliberately, premeditatedly, on purpose and of their malice aforethought did make an assault; and a certain revolving pistol, which was then and there loaded with gunpowder and leaden bullets, and by them, the said Edgar G. Bailey, James Forsha and William Moon in their hands then and there had and held, they, the said Edgar G. Bailey, James Forsha and William Moon, did then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of their malice aforethought, discharge and shoot off, upon and against him the said Albert Ferguson; and him the said Albert Ferguson with the leaden bullets aforesaid out of the pistol aforesaid then and there, by force of the gunpowder aforesaid, by the said Edgar G. Bailey, James Forsha and William Moon shot off and discharged as aforesaid, then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of their malice aforethought, did strike, penetrate and wound the said Albert Ferguson in and upon the body of him, the said Albert Ferguson, thus and thereby,

State v. Bailey.

then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of their malice aforethought, giving to him, the said Albert Ferguson, with the leaden bullets aforesaid, so, as aforesaid discharged and shot off out of the pistol aforesaid, by the said Edgar G. Bailey, James Forsha and William Moon, one mortal wound, of which said mortal wound the said Albert Ferguson from the said 19th day of March in the year aforesaid until the 20th day of March in the year aforesaid, did languish and languishing did live, and on which said 20th day of March in the year aforesaid, the said Albert Ferguson at the county of Jackson and State of Missouri, of the mortal wound aforesaid died; and so the prosecuting attorney aforesaid upon his official oath aforesaid, doth say, that the said Edgar G. Bailey, James Forsha and William Moon, him the said Albert Ferguson, at the county and State aforesaid, in the manner and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly, on purpose and of their malice aforethought did kill and murder; against the peace and dignity of the State.

"ROLAND HUGHES,

"Prosecuting Attorney.

"Roland Hughes, prosecuting attorney of Jackson county, Missouri, makes oath and says, that the facts stated in the above and foregoing information are true, according to his best information and belief.

"Roland Hughes.

"Subscribed and sworn to before me this 19th day of April, 1904.

"JOHN R. RANSON,

"Clerk of the Criminal Court of Jackson County, Missouri.

"By WM. L. MCCLANAHAN,

"Deputy Clerk."

The evidence in the case tended to establish the following facts:

In the month of March, 1904, there was a strike, in Kansas City on the part of the Hack Drivers' Union against the transfer and cab companies, in an effort to compel the companies to employ only union men. The defendant Bailey, although the owner of a hack himself, was a member of the union, and he, Forsha and Moon, both of whom were also members of the union, were taking an active part in the strike. The headquarters of the Hack Drivers' Union was located on Central, a little to the north of Ninth street, in Kansas City, and for two weeks prior to the date of the homicide, the defendant had been living with a woman by the name of Gertrude Biggs, at the Thelma Hotel, at the corner of Ninth and Central streets, and this hotel, the saloon that was located therein, and the room occupied by Bailey and Mrs. Biggs, seems to have been a place of rendezvous for Bailey and his two associates, Moon and Forsha. For several days prior to the 19th of March, the feeling engendered by the strike had become so pronounced that the defendant and his associates had apparently determined upon a course of violence to accomplish the purpose of the strike. Albert Ferguson, the deceased, was employed as a driver by the Landis Company and did not belong to the union. During the two weeks preceding the homicide, the defendant, Forsha and Moon were frequently together at the headquarters of the Hack Drivers' Union, at the Thelma Hotel, and the saloon therein.

On the night of the 18th of March, 1904, the defendant, Forsha, Moon and Gertrude Biggs were together at these headquarters. From there they went in a hack to a saloon on South Main street, kept by a man named O'Flaherty. After drinking awhile at this saloon, the Biggs woman ordered a hack by telephone, of one of the companies employing non-union hack-drivers, to come to 1625 Main street which was a house of ill-repute. This party of four then went to this latter place, and when the hack driven by Andrew Mey-

ers, a non-union hack-driver, called for them they got into the hack and ordered the driver to take them to a road-house at Twenty-ninth street, and Southwest Boulevard. They stopped, however, on the way at Broadway and Southwest Boulevard at a saloon, where they had a round of drinks. After they arrived at the road-house at Twenty-ninth and Southwest Boulevard, they took Meyers' revolver and cartridge belt, which he was wearing by virtue of the fact that he was a special officer, away from him by violence. The evidence shows that Bailey, the defendant, took the revolver and Forsha took the belt. Leaving the driver lying on the ground in the yard of the road-house where he had hitched his horses, the defendant and his associates above named returned to the Thelma Hotel, taking the revolver and the cartridge belt with them. Bailey and Gertrude Biggs went to their room; and the pistol that Bailey had taken by violence from Meyers, the non-union hack-driver, together with one that he himself carried, was secreted behind the radiator in their room. The party arrived at the Thelma Hotel about 2:30 in the morning of the 19th of March. After secreting the revolver, Bailey and the Biggs woman went down-stairs to the saloon, where they met Forsha and Moon, from which place the Biggs woman, at the request of defendant Bailey, went up-stairs and got the pistol that had been taken from the non-union hack driver, gave it to Bailey, who in turn handed it over to the bartender. After having had a round of drinks, the Biggs woman went up-stairs to bed, but at the request of Bailey she dressed and came down stairs again, and the four then went to labor headquarters, where Bailey, Moon and Forsha discussed the question from what carriage company they would be most likely to get a driver whom they could beat up with impunity. In the presence of all parties, Moon telephoned to the Landis Company to send a hack to the Coates house, and be sure to have it there at a certain

time, as otherwise the parties desiring it might miss the train. When the Biggs woman discovered the purpose of sending for another hack, she protested to Bailey against going out again, but he replied that he was going out, and directed her to go up to their room and get his revolver; this she refused to do, and then Forsha told Bailey to get the revolver that he, Bailey, had taken from Meyers at the road-house and had left with the bartender at the Thelma Hotel. The Biggs woman again protested against Bailey going with the party, telling him that he was drinking and ought not to go, and asked what he wanted his pistol for, and he answered that he was going to have the hack-driver whom they had called take them to Fifteenth and Central, and he wanted his revolver because if the hack driver "started anything" he would kill him, and also made the statement that he proposed to "get another scab before morning." The woman then consented to accompany the party, and Bailey got the revolver that he had left with the bartender, and the four went up in front of the Coates House at Tenth and Broadway, and waited the arrival of the hack which was driven by Albert Ferguson, the deceased. They got in the hack and directed Ferguson to take them to Fifteenth and Central. On the way the defendant, Moon and Forsha discussed the plan of action they would take when they arrived at their destination. It was agreed that Forsha and Moon should get out of the hack first and grab the hack-driver, that Bailey was then to take his revolver from him and beat him up as they had Meyers earlier in the night, and Bailey said that if the hack-driver started anything he would kill him. When the hack arrived at Fifteenth and Central it stopped at the corner, the hack-driver alighted and opened the door of the hack, and Forsha and Moon got out in the order named, and immediately grappled with the driver, Bailey followed immediately. It seems from some of the evidence that the hack-driver knocked Forsha

down, when the latter assaulted him, and as soon as Bailey got out of the hack, Forsha said, "Shoot him, shoot him, shoot the son of a bitch." The Biggs woman followed Bailey out of the hack and started to run east on Fifteenth street, Forsha and Moon having preceded her down the street. This left Bailey and Ferguson alone in the rear of the hack. Before the Biggs woman had gone half a block she heard Ferguson begging for mercy and calling for help, followed immediately by one shot and then in a short interval another shot, then a number of shots were fired in quick succession. The cries for help both preceded and followed the first shot. When the Biggs woman got to the first corner east of Fifteenth street and Central, she was overtaken by Bailey who said he thought he had killed "the son of a bitch," and catching hold of the Biggs woman's arm, told her she must run "like hell" or they would get arrested. The party of four separated at this place, Forsha and Moon going in one direction, and Bailey and the Biggs woman in another, agreeing to meet in Bailey's room at the Thelma Hotel. On the way to the hotel, Bailey told the Biggs woman again that he thought he had killed the driver Ferguson, applying to him a vile epithet. Bailey and the Biggs woman arrived at the hotel first, but were soon joined by the other two, and they then proceeded to coolly discuss what had happened. Forsha related that he had hit the deceased with a pair of brass knucks, but that it did not seem to "daze him." Moon spoke also of having hit him, and Bailey said that the deceased had "put up a hell of a fight" but he thought he had killed him, and Moon said, "if he had not he ought to." Next morning the Biggs woman went to see her sister, and Bailey, the defendant, went to serve as a judge of registration; that night, however, they returned to their room. On Sunday morning they learned from the newspaper that Ferguson was dead, and Bailey remarked to the Biggs

woman, "My God! that man that was shot at Fifteenth and Central, that scab hack-driver, is dead. I know what that means for me." That night the two went to a theater, but the next day Bailey remained in concealment until late in the evening when they removed to a room in Hasbrook place upon West Twelfth street, because, as Bailey said, he learned that the police were watching the Thelma Hotel; they sent for their clothes at the Thelma Hotel, and remained in their new hiding place for some time, until Bailey sent the Biggs woman out of the city to a sister who lived in Wetmore, Kansas, telling her to stay there until he sent for her, remarking that if she ever told what she knew they would both go to the penitentiary, and he might be hung.

At the time of the killing, two messenger boys, Bailey Boone and Ed Eckerd, were at the corner of Thirteenth and Broadway, which is about three blocks from Fifteenth and Central. Their attention was attracted by the shots, and they rode at once to the place of the homicide, where they found Ferguson leaning on a post. Ferguson said to them, "Come help me, I am shot; hurry up turn my hack around, I am dying!" We turned his hack around, "and he told us if his gun had exploded more than three times he would have killed one of the fellows." He wanted us to hurry up and get him to the police headquarters. "Well, Eckerd helped him into the hack, and he got up on the hack and drove on down Central towards Twelfth street, and Boone took the two wheels, rode one, and led the other." Ferguson the deceased was taken to the hospital where he made the following dying declarations, one to Dr. Sulzbacker, before an operation was performed, one to Assistant Prosecuting Attorney A. S. Lyman, after an operation was performed.

"Kansas City, Mo., March 19, 1904.

"I, Albert Ferguson, being wounded, and realizing my serious condition, being conscious and know-

ing that I stand in the presence of death, make this statement and declaration:

"Went to make a call for the Landis Carriage Co., went to Coates House on a call, there were four men there. One was disguised as a woman. Drove then to Fifteenth and Central. Got down to open the door, and they drew pistols on me. I hit one of them and knocked him down. He said, 'Shoot the son of a bitch,' and they shot. They started to run and I shot at them three times and they shot at me four times as I lay on the ground. Don't know if I could identify them or not.

"AL FERGUSON.

"Witnesses:

ELMER RILEY,
W. C. WARDE,
WM. CHRISTOPHER.

March 19, 1904.

"I, Al Ferguson, now at German Hospital, believing that I am about to die, and having no hope of recovery, do make the following statement of facts, leading up to my being shot and wounded this morning at about three o'clock:

"I have been driving for Landis. This morning shortly before 3 a. m. we got a call from the Coates House. Went there and took three men, and a man dressed in woman's clothes into my hack. They wanted me to drive them to Fifteenth and Central street. I drove there and got down to let them out. I opened the hack door. I found that the man had removed his woman's clothes, and there were four men there. As they got out they began to attack me. I defended myself as best I could. The third man who got out of the hack shot me in the abdomen. He was a medium-sized man with black hair. The first who got out of the hack said to me: 'We have got you, you son of a bitch, what are you going to do now?' After the third man shot me, they all ran away. I did not know any

of them. I am twenty-five years old, and am unmarried. I do not belong to the Hack Drivers' Union. No threats were made against me last night, and I had no trouble until I met them.

his

"AL  X  FERGUSON.

mark

"Witnesses:

A. S. LYMAN,

Dr. E. L. STEWART."

The next day he died. The fatal wound received by Ferguson was from a bullet which entered the abdomen three inches below and two inches to the right of the navel, taking a downward, backward and outward course, perforating the bowels and lodging under the spine at a point about two and a half inches below the brim of the hip bone and three inches in front of the spinal column.

A number of people who resided near Fifteenth and Central, that being a residence neighborhood, testified they were awakened by the shots and cries of the deceased. Their testimony agrees upon the proposition that there were two series of shots, between which there was a slight interval, and that the cries that they heard immediately followed the first shot. William A. Satterlee, assistant general manager of the Metropolitan Street Railway Company, who resided at 221 West Fifteenth street, testified that he was awakened by the first shot, went to his window and saw a man stand at the northeast corner of Fifteenth and Central and fire two or three shots in a westerly direction and then turn and run east on Fifteenth street. Before these shots were fired, during the firing and afterwards, he heard the cries for help.

As already stated, Bailey, the defendant, served as a judge of registration on Saturday, March 19th, after his night of dissipation and participation in the occurrence above stated. During that day the subject

of the shooting of Ferguson, the non-union hack-driver, was discussed by the judges and clerks of election; one of the judges made the remark that the hack-drivers could never expect to win the strike by shooting people. Bailey said that "that was the only way to win; they all ought to be killed." When Bailey was arrested and taken to the police station, the chief of police charged him with having killed Ferguson; he denied it and denied having anything to do with it or any knowledge of it.

The foregoing is in substance the principal facts shown in behalf of the State.

Defendant Bailey testified in his own behalf. He stated that about three o'clock in the morning of the 19th of March, 1904, he was at the union headquarters of the hack-drivers of Kansas City, was there possibly a half hour or longer; that besides the three parties who went there with him he thought there were possibly a dozen other people around the headquarters; that when he came out of the labor headquarters he went to the Coates House, because there was a carriage call, as he was told, and he went up there to take a carriage ride; he met this carriage, and took a carriage ride. Asked who invited him to go on that ride, he answered that it was either Moon or Forsha, possibly both. When they got to the Coates House, the carriage had not yet arrived, but they only had to wait a little while, just a moment. Their party consisted of Forsha, Moon, Mrs. Biggs and himself. One of the party, "I think it was Forsha, directed the driver to go to Eighteenth and Grand." Ferguson, the driver, asked him where to go, and something was said about Eighteenth and Grand, and Moon spoke up and said, "Fifteenth and Central." Ferguson, the driver, went on Broadway to Fourteenth, then on Fourteenth street east. Q. "Did he pass Fourteenth and Central?" A. "He got off Central when Mr. Forsha says, 'Where are you going, don't you know the way to Fifteenth and

Central, you have scabbed long enough,' and Ferguson replied that he did not care to hear any remarks from union bastards like we were." He testified he took no part in this conversation. When they reached Fifteenth and Central, Ferguson got down off of the hack and opened the door and said, "Get out of here you union bastards," and as Forsha went to step out he said to Ferguson, "What is that you got there in your hand?" and in reply to this, Ferguson knocked Forsha down with his fist. Moon followed immediately and Ferguson struck at him and thereupon Moon and Forsha got up and ran away. The defendant testified that he was the third to get out of the hack, but the woman followed immediately and disappeared, and they all three ran off and left him there with Ferguson. "Ferguson was standing close to the hack with a gun in his right hand, he shot and I felt a bullet pass right side of my head close enough so that I felt a little wind or something of that kind. I jumped towards him and grabbed him by the wrist and wrestled around with him, I threw his hand away from me the best I could, turned it away from my face. The hack was standing kind of in a southwesterly-northwesterly direction, at the corner of Fifteenth and Central, about from five to nine feet from the street lamp. We wrestled and in the scuffle we got over here behind the hack. During this scuffle or struggle, as I threw his revolver away from my face the best I could, he fired and the bullet went through my coat; this is not the coat I was wearing at that time. The bullet went through the lapel of my trousers and through the outside shirt; it numbed my stomach to such an extent I thought he had shot me. I thought he had shot me through the stomach; I still had hold of his hand and shoved it away from me as best I could; he stumbled and kind of fell or partially fell and was kind of in a kneeling position and drew his gun right across the wheel of the hack,

and at that I jerked out my gun, out of my pocket, and commenced to fire; when we were scuffling I told him 'for God sake not to shoot, I would pay him for the hack.' I addressed him in that manner, I would not be positive those were the very words, a number of times. Four or five times I asked him not to shoot; I started back and commenced to shoot, I guess I was possibly eight feet from him." Asked what the deceased said when defendant told him to stop or he would shoot him, he said deceased said "by hell" or something of that kind, "he was trying to get in a position so as to shoot me, I was in a easterly direction from him, he was kind of behind the hack, he was west from me." Asked why he shot deceased he answered, "It was either me shoot him or he shoot me, because there was no chance for me to run; if I ran from him he had that gun in such a position that I would be gone, that is all." On cross-examination he stated that he lived in Kansas City about seven years, was well acquainted with the town. Year before that he had driven an ice wagon up to Hasbrook place. He had been driving a hack in Kansas City, which he purchased about a week or ten days before the Carnival. He stated further that they were just going out to get some more drinks and take a ride, did not have any other purpose on his part when they started from the Coates House that night. He stated that there were nothing but residences in the neighborhood of Fifteenth and Central, no public house there to his knowledge and no saloon to drink at there. He did not know where they were going until he got into the hack and this order was given. "I cannot say that there was any definite statement that anything was to be done or would be done at Fifteenth and Central, I was not in a very good condition." He stated that his gun was in his overcoat pocket on the right hand side; it was a common affair for him to carry it in his overcoat pocket.

Other facts and the instructions will be noted and discussed as occasion may require in the course of the opinion.

I.  The information, which has already been set forth in full in the statement of this case, is challenged as insufficient on the ground that the defendants are not charged with having inflicted upon the deceased, Albert Ferguson, the wound of which he died.  This criticism is leveled at the clause in the information which reads as follows: ''and a certain revolving pistol which was then and there loaded with gunpowder and leaden bullets and by them the said Edgar G. Bailey, James Forsha and William Moon in their hands then and there held did then and there feloniously, willfully, premeditatedly, on purpose and of there malice aforethought discharge and shoot off at, upon and against him, the said Albert Ferguson, and him, the said Albert Ferguson, with the leaden bullets aforesaid out of the pistol aforesaid then and there by the force of the gunpowder aforesaid by the said Edgar G. Bailey, James Forsha and William Moon shot off and discharged as aforesaid, then and there, feloniously, willfully, deliberately, premeditatedly, on purpose and of their malice aforethought did strike, penetrate and wound, the said Albert Ferguson, in and upon the body of him the said Albert Ferguson, thus and thereby, then and there feloniously, etc., giving to him, the said Albert Ferguson with the leaden bullets aforesaid so as aforesaid discharged and shot off out of the pistol aforesaid by the said Edgar G. Bailey, James Forsha and William Moon, one mortal wound.''

Learned counsel for the defendant has indulged in an extensive criticism of the foregoing words as ungrammatical, but after a careful review of the elementary principles we find ourselves unable to agree with him that the information does not charge the defendants with having inflicted the wound upon the de-

ceased, Albert Ferguson, from which he died. The ob-
jection urged against this information was made by
the same learned counsel to the information in State
v. Nelson, 181 Mo. 340, and we held there that the in-
dictment sufficiently charged the defendant with the
infliction of the wounds upon the deceased, and called
attention to the fact that it was clearly distinguish-
able from State v. Edwards, 70 Mo. 480, and State v.
Manning, 168 Mo. 418. In the last-mentioned cases
the indictments charge the deceased with inflicting the
wounds upon himself, but in this information it is
distinctly averred that the defendants with the leaden
bullets shot out of the pistol which was held in their
hands inflicted the mortal wound of which the de-
ceased, Ferguson, died. The information is sufficient
and not subject to the objection made.

It is further objected that the information is insuffi-
cient in that the verification contains no venue. We
think there is no merit in this contention. The infor-
mation and verification are upon the same sheet of pa-
per and the venue is laid in the beginning in the county
of Jackson, State of Missouri, and the affidavit was
taken and certified by the clerk of the criminal court
of Jackson county, Missouri. It was entirely unnec-
essary for the clerk to repeat the venue under these
circumstances. Every presumption of law is that the
clerk took and certified this affidavit within the ter-
ritorial bounds in which he was authorized to adminis-
ter oaths.

II. At the beginning of the trial, counsel for de-
fendant filed and presented to the court a motion to
permit and allow exceptions to all adverse rulings on
objections interposed by the defendant, on the trial,
without announcing such exceptions to the court at the
time, on the ground that the saving of such exceptions
would create in the minds of the jurors a prejudice

against the defendant. This motion the court over-ruled.

The practice in this State has long been settled that objections to the admission of testimony or to improper remarks of court or counsel during the trial must be made at the time and the grounds of objections stated and if the decision be against the objector he should save his exceptions at the time, and the practice in this regard is the same in criminal cases as in civil. And unless exceptions are thus saved it is uniformly held by this court that the rulings of the trial court will not be reviewed by us. [State v. Hope, 100 Mo. 352, 354; Hickman v. Green, 123 Mo. 172, 173; State v. Scullin, 185 Mo. 709; State v. Williams, 186 Mo. 128.]

Learned counsel, however, call our attention to the fact that in the circuit court for the trial of civil cases in Jackson county, the judges invariably allow such exceptions to appear in the record and bill of exceptions, by common consent, without the exception having been called to the attention of the court at the time. The conduct of a trial is oftentimes a matter within the discretion of a trial court. The rule above noted is for the protection of trial courts that they may not be adjudged guilty of error in a matter which was not called to their attention and an opportunity given them to correct any oversight or error they may have committed, without putting the injured party to the expense of an appeal to this court, but if the circuit court sees fit to consider the exceptions saved to every ruling which they make and certify to this court that the exceptions were duly saved, we can see no objection to the practice; but because one trial court sees fit to allow this course to be pursued is no reason why another court should decline to do so, and elect to be governed by the universally accepted practice in such matters. It is too plain for discussion that the criminal court did not err in overruling this motion and requiring counsel to save their exceptions

in the due and orderly course of practice long approved by this court.

III. The next assignment of error is that the criminal court erroneously permitted the State to call and examine several witnesses, among others Mrs. Stevens, Miss Johnson, Miss Hudson, Mr. Satterlee and his wife and two others, although their names had not been indorsed upon the information when it was filed. It should be stated in this connection that the trial began on the twenty-seventh of June, 1904, and the examination of witnesses began on the thirtieth of June. On the twenty-ninth of June the prosecuting attorney served Mr. Riggs, one of the counsel for the defendant, with a list of names of additional witnesses which had not been indorsed upon the information, and upon that list the names of the witnesses above mentioned appeared.

This objection is predicated upon section 2517, Revised Statutes 1899, which provides that "when an indictment is found, the names of all the material witnesses must be indorsed on the indictment; other witnesses may be subpoenaed or sworn by the State." This section has been before this court for consideration on various occasions and, as said in State v. Shreve, 137 Mo. l. c. 5, "while this court has invariably held that the spirit and letter of our law both concurred in requiring the names of the witnesses to be indorsed in order to enable a defendant to know by whom the charge against him is to be established, still it must often occur that new evidence is discovered, and no good reason appears why the State must be denied the right to use it." Certainly the objection in this case has little merit, since the supplementary list of witnesses whose names were not indorsed on the information was furnished counsel for the defendant before any witness was sworn in the case, and after the defendant had received this supplementary list, he did

not ask for a continuance or time in which to investigate concerning these additional witnesses, and those to which this objection was made were persons easily accessible to the defendant, and so well known in the city where the trial was held that no unfairness or injustice can reasonably be charged because they were not indorsed on the information. Thus Clara Stevens and Mabel Hudson were employees at the Thelma Hotel, Dr. Boarman was assistant coroner of Jackson county; Mr. Lyman was assistant prosecuting attorney, and Mr. Satterlee, assistant general manager of the Metropolitan Railway Company, and three of the other witnesses were election officers who were at the election booth with defendant on the day of the homicide and doubtless well known to him. Mr. Hayes was chief of police of Kansas City. The conduct of the prosecuting attorney, instead of displaying any disposition to take an advantage of the defendant, was eminently just and fair.

No case in this court on this statute gives any countenance to the contention of the defendant on this point. [State v. Henderson, 186 Mo. 473.]

IV. In the several able and exhaustive briefs by counsel for the defense it is earnestly insisted that the criminal court committed prejudicial error in permitting the State to prove that on the same night and prior to the killing of Ferguson, these same four parties, Bailey, the defendant, Moon and Forsha and the woman Biggs, had called up another non-union hack and driver and had directed him to take them to a roadhouse on Southwest Boulevard, and while they were at this road-house forcibly and feloniously took from Meyers, the said non-union hack-driver, a revolver, with which the defendant afterwards killed Ferguson. It is urged that this evidence was utterly incompetent and irrelevant and tended to prove a crime not alleged either as a foundation for a separate pun-

ishment, or as aiding the proofs that the defendant was guilty of the one charged, and does not fall within the exceptions to the general rule which excludes evidence of other crimes than that for which the defendant is on trial, and State v. Spray, 174 Mo. 569, is relied upon to sustain this exception and assignment of error. In this last-mentioned case both the rule and the exceptions received the most careful consideration and distinction, and with the conclusion reached therein we are entirely satisfied.

The question presented now is whether the evidence falls within either of the exceptions recognized by this court, in the Spray case, and so lucidly stated in People v. Molineux, 168 N. Y. 264, wherein it is stated: ''Generally speaking, evidence as to other crimes is competent to prove the specific crime when it tends to establish first, motive; second, intent; third, the absence of mistake or accident; fourth, a common scheme or plan embracing the commission of two or more crimes, so related to each other that proof of one tends to establish the others; fifth, the identity of the person charged with the commission of the crime on trial.'' As an argument against the admissibility of this evidence of the assault upon, and of the forcible taking of the revolver from, Meyers, the non-union hackman at the road-house on Southwest Boulevard a few hours prior to the homicide under investigation, counsel for the defendant in his brief says: ''When defendant was arrested he admitted the killing and claimed self-defense. When Moon and Forsha were arrested they stated Bailey did the killing, which facts were in possession of the State before the commencement of the trial.'' This statement of counsel is not borne out by the record, in which it appears that Bailey denied the killing and all knowledge of it, when charged with having committed it by the chief of police, and nowhere in the record does it appear that Moon and Forsha stated that Bailey did the killing,

neither does it appear that the criminal court admitted this evidence for the purpose of showing that the defendant and his said associates had committed a murderous assault on the other non-union hack-driver, but limited the evidence as to what occurred at the roadhouse to the fact that Bailey, the defendant, Moon and Forsha took from Andrew Meyers, the non-union hackman, the pistol with which Bailey, the defendant, afterwards killed Ferguson. Keeping in view the distinct theories of the State and the defendant as to the purpose and intent of the defendant and his associates in making the call for Ferguson, the deceased hackman, and in causing him to meet them at the Coates House several blocks distant from the Thelma Hotel, from which place they sent the order by telephone to the Landis stables, the State contending that this evidence demonstrated that the defendant and his associates had Ferguson, the deceased, meet them at the Coates House and drive them to Fifteenth and Central, a lonely residence portion of the city, for the purpose of committing upon him a felonious assault, and if he resisted kill him; on the other hand, it was the theory of the defense that the defendant and his associates had the deceased drive them to this lonely part of the city for the sole purpose that they might enjoy a hack ride and perhaps get some drinks. It was the contention of the State that evidence that the defendant and his associates had not only been active in the hack-drivers' strike then going on in Kansas City, but had determined upon a course of violence in order to accomplish the purpose of the strike, and that as tending to show the intent with which they lured Ferguson, the deceased, to drive them out to Fifteenth and Central, and to show a common scheme embracing the commission of two or more crimes so closely related to each other that proof of one tends to establish the others, it was pertinent and competent to show that on this same night and but a few hours previous to

the homicide they had another non-union hack-driver, one who bore the same relation to the strike that Ferguson, the deceased, did, take them to the road-house on Southwest Boulevard, another remote and lonely place, and had, there, by violence taken the pistol from him with which the defendant afterwards killed the deceased, Ferguson. That it was entirely competent for the State to prove that the pistol with which defendant killed Ferguson was the property of the other non-union hack-driver, Meyers, and the circumstances under which the defendant obtained it from Meyers a few hours before he killed Ferguson, and that it tended to prove that defendant was the person who did the killing, or in other words, the identity of the person charged with the commission of the crime, we think there can be no sort of doubt, but we go further in this case: the defendant is charged with wilful, deliberate and intentional murder and it devolved upon the State to show the intent and the circumstances tending to prove deliberation and the motive if possible, and we think it was entirely competent to show the felonious assault by the defendant and his associates upon the other non-union hackman, Meyers, as a part of a common scheme to insure the success of the hack-drivers' strike, by resorting to acts of violence and felonious assault upon non-union hackmen, and thereby intimidate and so terrorize them that they would not dare to drive a hack or work for transfer companies and livery men, who insisted on employing non-union hack-drivers. In a word, this evidence tended strongly to show that the calling of the non-union hackman, Meyers, and causing him to drive them to a remote part of the city, and then and there by violence and force taking his revolver from him, was a part of the same composite crime or plan which the defendant and his associates were pursuing with reference to other non-union hack-drivers, and shed light upon the purpose which they had in view when a few hours afterwards

they succeeded by false representations to have Ferguson, the deceased, meet them at the Coates House and drive them to Fifteenth and Central and that purpose was to commit upon him a felonious assault, and if he resisted, kill him. This evidence was calculated to disprove the claim of the defendant that their only purpose was to enjoy a hack ride at three o'clock in the morning, or to get drinks, when they were driving away from the place where the saloons were kept into a remote neighborhood of private residences only. The case is clearly distinguishable in all facts from State v. Spray, supra, in which no question of motive or intent was involved, but in which the robberies in each case were separate and distinct transactions, and the facts of each furnished its own motive and intent. It has long been decided in this State that evidence of this character, illustrative of the principal act in the tragedy, and a part of a system of criminal acts so connected together that each tends to establish the guilty intent, design and purpose of the other, is competent.

Underhill in his work on Criminal Evidence, section 88, thus states the doctrine:

"No separate and isolated crime can be given in evidence. In order that one crime may be relevant as evidence of another, the two must be connected as parts of a general and composite scheme or plan. Thus the movements of the accused prior to the instant of the crime are always relevant to show that he was making preparations to commit it. Hence, on a trial for homicide, it is permissible to prove that the accused killed another person during the time he was preparing for or was in the act of committing the homicide for which he is on trial. And, generally, when several similar crimes occur near each other, whether in time or in locality, as, for example, several burglaries or incendiary fires upon the same night, it is relevant to show that the accused, being present at one of

them, was present at the others if the crimes seem to
be connected." This connection was made to appear
in this case not only by the relation which the defend-
ant and his associates as union hackmen on a strike
bore to the deceased and other non-union hackmen,
but also from the statements of the defendant of his
intention to kill "another scab before morning," and
the similarity of the plan with which he and his asso-
ciates had treated both Meyers and the deceased, Fer-
guson. [State v. Dettmer, 124 Mo. 433; State v. Math-
ews, 98 Mo. 129; State v. Jones, 171 Mo. 1. c. 407; State
v. Rudolph, 187 Mo. 67; State v. Greenwade, 72 Mo.
300.]

Hence, as already said, we think this evidence was
competent to establish the identity of the defendant as
the person who committed the crime; to show that it
was intentional and wilful, and to show that he was
one of a band organized together to commit crimes of
the kind charged, and to connect the offense with
which he is charged in this case as a part of a com-
mon, unlawful and felonious scheme.

The statement of the defendant on the same day
of the homicide and subsequent thereto, in the pres-
ence of the witness Cooper, when one of the judges had
stated that the hack-drivers could never expect to win
a strike by shooting people, to the effect that, "That
was the only way to win, and they all ought to be
killed," was not improperly admitted; it was a volun-
tary statement of the defendant and taken in connec-
tion with the other facts already noted tended to es-
tablish the motive and intent which actuated him at
the time of the homicide. There is nothing in the case
of State v. Evans, 65 Mo. 574, which militates in the
least against this conclusion. In the Evans case the
defendant, and not the State, offered to prove his own
declarations which were no part of the *res gestae*, a
very different thing from the State proving state-

ments or admissions made by the defendant whether before or after the commission of the offense.

Now as to the 6th assignment, which relates to the State's witness Lee, as to a statement as to the vile epithet applied by the defendant to non-union hack-drivers the morning after the killing. It is to be observed that the counsel for the defendant did not object to the question until after the witness had partially answered it. The witness never finished the sentence, but as far as he did go, his answer showed a bitter feeling on the part of the defendant towards the non-union hack-drivers, but it is clear that the simple fragment of evidence that they thus elicited furnishes no ground for reversal of the judgment.

V. Among other instructions the court gave the following, numbered 13:

"The court instructs the jury that if you find from the evidence that the defendant, Edgar G. Bailey, shot and killed the deceased and at the time he shot him, the deceased was about to kill defendant or to do him some great bodily injury, he had the right to shoot and kill in his own defense, but to justify such shooting and killing you must find from the evidence that the defendant did believe and had reasonable cause to believe from all appearances that such injury was about to be done him and that he shot deceased to prevent such injury. It is not necessary that the danger should have been actual and about to fall on him, but it is necessary for him to have believed it from all appearances and that there should have been, at the time he shot, reasonable cause for such belief. It is for you to say from the evidence in the case whether the defendant did believe and had reasonable cause to believe from all appearances that such impending harm at the time he shot was about to fall upon him. If, as a fact, he did not have reasonable cause to believe from all appearances that such danger was impending at the time he shot, then it is not justifiable,

his believing himself in danger is not sufficient, he must have had reasonable cause to believe it from all appearances and of that you are to determine from all the facts and circumstances in the case.''

And instruction number 4:

''The court instructs the jury that if the defendant voluntarily brought on the difficulty with deceased, or voluntarily entered into a difficulty with deceased, with the intention of killing or inflicting upon him some great bodily injury, if he should resist, then the danger in which he found himself, during such difficulty, no matter how great it might be, would not extenuate or mitigate the offense, or reduce its grade at all, and there can be no self-defense in the case.''

The criticism made on this instruction is that the phrase, ''with the intention of killing or inflicting upon him some great bodily injury,'' does not modify or qualify the antecedent phrase, ''that if the defendant voluntarily brought on the difficulty with deceased,'' but that said phrase, ''with the intention of killing,'' etc., applies only to the second clause, that of voluntarily entering into the difficulty with the deceased, and when thus divided, the first clause of the instruction would clearly be erroneous, and in conflict with the rule announced in State v. Partlow, 90 Mo. 608. It is further objected to this instruction that it tells the jury that the defendant is guilty if he had a felonious intent *upon condition*. Now, as to the first objection to the instruction above noted, we think there is no merit in the criticism; the phrase, ''with the intention of killing or inflicting upon him some great bodily injury,'' clearly refers to and modifies both of the preceding clauses in the instruction, and when thus read and understood in no manner conflicts with the rule announced in State v. Partlow, or State v. Herrell, 97 Mo. 105, but simply announces the sound and wholesome law that if one brings on a difficulty with the purpose of wreaking his malice by slaying his adversary,

or doing him some great bodily harm, and actuated by such a felonious purpose does the homicidal act, then there is no self-defense in the case and he is guilty of murder in the first degree and nothing less. [State v. Sharp, 183 Mo. 715; State v. Pennington, 146 Mo. l. c. 35.]

As to the second ground of objection to this instruction, to-wit, that it charges the jury that the defendant is guilty if he had a felonious *intent upon condition,* we think it is clearly groundless. One may intend to way-lay another and kill him *if* that other comes that way, or he may arm himself and go in search of another intending to kill him *if* he can find him, or *if* any one interferes, in either of which cases if he does encounter his victim and under such circumstances and with such intention slay him, he will be guilty of murder in the first degree. The evidence in this case on the part of the State tended to show that the defendant and his companion Moon and Forsha went out to Fifteenth and Central streets with the intention to assault and beat up the deceased, Ferguson, in order to create an opportunity to kill him. The alleged condition expressed in these circumstances was no condition at all, for the defendant and his companions well knew or were bound to know that no man of any spirit whatever would stand still and submissively permit another to beat him up without resisting. The fact that the defendant took two confederates with him, and went armed with the deadly weapon on what his counsel are pleased to call "an innocent hack-drive," shows that he was expecting resistance and was actually seeking and trying to bring on a difficulty for the purpose of killing Ferguson whom he had denominated "a scab hack-driver;" in a word, intended to present to Ferguson the alternative of quietly submitting to a brutal assault or being killed. The so-called condition upon which Ferguson might have escaped death was in fact no condition as far as

the intention of the defendant and his associates was concerned and under the deliberate plan of action agreed upon by the defendant and his associates. In 1 Wharton's Criminal Law (10 Ed.), sec. 315, the learned author says: "Independently of the statutes, it has been said that though A., in anger, from preconceived malice, intended only to severely beat B., and happened to kill him, it will be no excuse that he did not intend all the mischief that followed; for what he did was *malum in se,* and he must be answerable for its consequences. He beat B. with an intention of doing him great bodily harm, and is therefore answerable for all the harm he did." And in section 108 of the same volume, the learned author says: "No plan of wrong, therefore, can be framed by even the most capable and cautious of conspirators, which they must not regard as dependent upon contingencies for its consummation. An assailant, therefore, in meditating an attack on another, must contemplate the possibility of miscarriage. This possibility may be greater or less. A good marksman may be almost sure of hitting his intended victim; a man who sends an explosive compound to an enemy may estimate that the probability of injuring his enemy is slight. If the means adopted are such as cannot possibly succeed, then there is no such connection between the instrumental intent and the final intent as is essential to constitute guilt. But if there be no such impossibility, and if the means adopted, improbable as it would seem, have a fatal result, then the end is to be regarded as having been intended."

The Supreme Court of Illinois, in Mayes v. People, 106 Ill. 313, said: "When an action, unlawful in itself, is done with deliberation, and with intent of mischief or great bodily harm to some particular person, or of mischief indiscriminately, fall where it may, and death ensues from such act, against or beside the original intention of the party, it will be murder."

State v. Bailey.

"The plea of provocation will not avail in any case where it appears that provocation was sought for and induced by the act of the party in order to afford him a pretense for wreaking his malice." [Wharton on Homicide, sec. 438; 2 Bishop on Crim. Law, sec. 702; State v. Pennington, 146 Mo. 36.]

In this connection it is earnestly insisted that instruction number 4 completely eliminated the question of self-defense, but the court in instruction number eleven told the jury "that if they found and believed from the evidence that the defendant at the time he entered the hack which took him and the others to Fifteenth and Central streets, had no intention of killing Albert Ferguson or to do him great bodily harm, and had no intention at any time previous to the time the said Albert Ferguson drew a revolver and shot at the defendant, if you find from the evidence that he did so shoot at him, then the right of self-defense on the part of the defendant exists in law, and the jury are instructed that the defendant has the legal right to invoke the law of self-defense in his favor." And in instruction number thirteen gave the usual and full instruction on the right of self-defense. There is no conflict between these instructions. The question of the intention of Bailey, the defendant, as to inflicting great bodily harm upon Ferguson or of killing him, or the absence of such intention determines the application of either instruction number four or instruction number eleven to the facts of the case. Under the testimony of the defendant he shot in self-defense and according to the State's evidence he had Ferguson, the deceased, bring him to Fifteenth and Central in order that he, the defendant, might kill, or do Ferguson great bodily harm, and hence there was no consistent middle ground upon which to base instruction number fourteen requested by the defendant, to the effect that "if Bailey, the defendant, provoked the difficulty with

Vol 190 mo—19

the deceased, or produced the occasion without any felonious intent, intending, for instance, an ordinary battery merely, or disturbance of the peace, or an annoyance of Ferguson by calling him to Fifteenth and Central streets for the purpose of taking away from him, in order to annoy him, his revolver, or other insignia of authority, and there, thereupon, the deceased, Ferguson, attacked Bailey and compelled Bailey, in order to save his own life, to take that of deceased, still the law while it would not entirely justify the homicide, on the ground of self-defense, would hold the defendant guilty of no higher crime than that of manslaughter in the fourth degree.'' There was absolutely no evidence upon which to base this instruction number fourteen. The evidence before us presents two theories alone, that, by the State, that the defendant and his companions brought on the difficulty with a felonious intent of beating up the deceased in order that they might have an excuse for killing him; and that of the defendant, unreasonable as it appears, of an innocent hack-drive at three o'clock in the morning in a lonely residence portion of the city, and of an entirely unprovoked and uncalled for assault by the deceased, a non-union hack-driver, upon the defendant and his companions, and the killing by the defendant of the hack-driver as a last resort in self-defense. In neither was there the slightest evidence upon which to base an instruction of withdrawing from the contest after the difficulty had been brought on. Instructions in all cases, civil and criminal, must be based upon the evidence in the cause. Instructions number eleven and thirteen fully presented the law from the defendant's standpoint. If the facts were as he testified, he acted in self-defense, and was not guilty of any grade of homicide, and the court should not have invited the jury to compromise him into the penitentiary by finding him guilty of manslaughter. On the other hand,

there was evidence from which the jury under the instructions of the court might have found him guilty of murder in the first or second degree and the court fully instructed upon both of those degrees. We think the court properly refused to instruct upon manslaughter in either degree in the light of the evidence developed in this record. [State v. Gartrell, 171 Mo. 489; State v. Lewis, 118 Mo. 79 l. c. 83.]

The court carefully instructed the jury as to what constituted a just cause of provocation to passion as to reduce the grade of the homicide from murder in the first degree to murder in the second degree.

VI. There was no error in refusing the instruction number five asked by the defendant to the effect that the jury should take into consideration specially what weight ought to be given the witness Catharine Biggs. Leaving out of view that the Biggs woman was named Gertrude and not Catharine, there was no reason why the court should single out her testimony and comment on it separately. The only evidence tending to show that she was an accomplice and therefore the court should have given a cautionary instruction as to her testimony, was her own, and according to that she did not join in the common purpose of her three male companions, but was protesting against it all the time, and only accompanied the defendant upon the hack ride in response to the demands of Bailey.

VII. The court did not err in failing to define, other than it did, the terms "self-defense" and "bring on the difficulty." The term "self-defense" was fully and carefully defined to the jury in instruction number thirteen, and the attempt to have defined the words "bring on a difficulty" would have simply resulted in either confusing the jury or have added nothing to their plain ordinary significance. Both of these terms are self-explanatory. We think though this question

is not before us properly because no exception was saved to the failure of the court to instruct thereon.

VIII.   So far we have endeavored to meet and discuss the various propositions announced by counsel for defendant in two of the briefs filed by them, but there is still another brief by another of the counsel for the defendant in which it is earnestly insisted that the criminal court erred in refusing instruction number fourteen asked by the defendant.  Counsel urges that there was sufficient evidence upon which to base this instruction, and to leave it to the jury to say whether or not the defendant brought on the difficulty with the intention of committing a mere common assault upon, or to take away from Ferguson, the deceased, his revolver, and we are again cited to what was said in State v. Partlow, 90 Mo. 622, which has often been approved and reasserted by this court as follows: "Indeed, the assertion of the doctrine that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplishing such purpose, is guilty of murder, and cannot avail himself of the doctrine of self-defense, carries with it in its very bosom, the inevitable corollary, that if the quarrel be begun *without a felonious purpose,* then the homicidal act will not be murder." The law of this State is that if the original wrong or assault would have been a mere misdemeanor, and such was the purpose of the accused when he committed or engaged in it, then the homicide growing out of or occasioned by it, though in self-defense from any assault made upon him, would be manslaughter.   As already said, the criminal court instructed upon the defendant's own evidence on the law of perfect self-defense in its instruction number thirteen, and in the instruction numbered four and instruction number eleven the court instructed the jury "that if the defendant voluntarily brought on the difficulty with de-

ceased, with the intention of killing or inflicting upon him some great bodily injury, then the danger in which he found himself, during such difficulty, would not extenuate or mitigate the offense, or reduce its grade at all, and there was no self-defense in the case." And in its instruction number eleven, the court further told the jury, however, "that if they should find and believe from the evidence that the defendant at the time he entered the hack to ride to Fifteenth and Central streets, had no intention of killing Ferguson, or of doing him any great bodily harm, and had no intention of doing so at any time previous to the time the deceased drew his revolver and shot at the defendant, if in fact they found that he did shoot at him, then the defendant had a perfect right of self-defense and to slay Ferguson." We have already said that in our opinion there was no evidence of a withdrawal from a combat brought on by the defendant, or of an intent to commit a mere common assault upon the deceased. No witness for the defendant, nor he himself, testified to any intention to go to Fifteenth and Central streets for the mere purpose of committing a common assault on the deceased or to take from him his revolver. We have searched the record carefully, and on the part of the defendant, he testifies that his purpose in going to Fifteenth and Central that night was only "to take a ride," and he supposed, "to have some drinks." We are not left to speculation so far as his testimony is concerned as to what his intention in taking this ride and in going to the place of homicide, was. There is not a scintilla of evidence falling from his lips that his intention was to commit a mere common assault or to annoy the deceased by taking his revolver from him, and therefore there was nothing in his testimony which would have justified the giving of the fourteenth instruction prayed for by him. But leaving his testimony, for a moment, out of view, and turning to the evidence in behalf of the State, we have

the case of a defendant with two other accomplices armed with a deadly weapon resorting to a scheme by which they induced the deceased to take them to a lonely part of the city at three o'clock in the morning with the deliberately expressed intention of "beating him up," and as a part of this scheme, Forsha, one of his accomplices, was to grab him and disarm him. When the woman Biggs protested against the defendant going with this party, and asked him what he wanted his pistol for, he replied, that he was going to have a hack-driver take them to Fifteenth and Central, and he wanted his revolver, and if the hack-driver "started anything" he would kill him, and that he would "get another scab before morning," and the evidence further shows that as the defendant got out of the hack, Forsha, one of the accomplices, immediately said, "Shoot him, shoot him, shoot the son of a bitch." And the evidence further discloses that before any shot was fired, the deceased was heard begging for mercy and crying for help. To say that this evidence affords any foundation for an instruction that the defendant and his accomplices intended to commit a mere ' common assault would be to disregard all human experience and to attribute a purpose wholly at variance with the expressed intention of the defendant and his accomplices when they started upon that extraordinary ride that night. If the evidence of the State is to be credited at all, and it evidently was believed by the jury, it was fairly susceptible of one construction only, and that was a deliberately formed design on the part of the defendant and his associates Moon and Forsha to beat up Ferguson, the deceased, for the purpose of causing him to resist, in order to have an ostensible excuse for killing him. To say that the defendant in the circumstances following fast after his declaration that he proposed "to get another scab before morning," and armed with a deadly weapon, only intended to commit a common assault, is

contrary to human intelligence and opposed to all human experiences, and in our opinion furnishes no basis whatever for the hypothesis announced in instruction number fourteen. And it follows, therefore, that neither the defendant's own evidence, nor that on the part of the State, furnishes any ground for the fourteenth instruction asked for by the defendant, and left the case just as the instruction given by the court presented it to the jury, to-wit: on the theory of the defendant, of a perfectly innocent hack drive and an uncalled for and murderous assault upon him by the deceased, and the killing of the deceased in self-defense as his only resort; and on the part of the State, of a preconcerted plan and formed design to kill the deceased by the defendant and his associates bringing on a difficulty with the intent to kill the deceased or do him some great bodily harm, and if so there was no self-defense in the case, however great the exigencies in which defendant found himself by reason of his own illegal acts.

We have thus examined all the assignments of error and the record in this case with a view to ascertain whether the criminal court afforded the defendant a fair and impartial trial, or was guilty of prejudicial error in the trial of the defendant. We have reached a conclusion that there is no reversible error in the record, and that the evidence is sufficient to justify the verdict of the jury. The result is that the judgment of the criminal court must be and is affirmed, and the sentence which the law pronounces must be carried into execution, and it is so ordered.

*Fox, J.,* concurs; *Burgess, P. J.,* absent.