Tommy Lee DAVIS and Minnie Lee Davis, Plaintiffs-Appellants,

v.

Leander C. MOORE and Lloyd Simpson, Defendants-Respondents.

No. 37301.

Missouri Court of Appeals, St. Louis District.

June 28, 1977.

Goldstein & Price, Elmer Price, St. Louis, Tom Mendelson, University City, for plaintiffs-appellants.

Wayman F. Smith, III, St. Louis, for defendants-respondents.

NORWIN D. HOUSER, Special Judge.

Appeal by Tommy Lee Davis and his wife Minnie from an adverse judgment, entered upon a 9 to 3 jury verdict for defendants, in plaintiffs' action for wrongful death of their 20-year-old son Tyrone. Defendants Moore and Simpson, police officers of the City of Kinloch, shot and killed Tyrone in an attempt to arrest him. Admitting that they fired upon Tyrone, defendants sought

exoneration from civil liability for his death under § 544.190, RSMo 1969 [1] on the ground that they were using the necessary means to effect the arrest of a fleeing felon.

According to defendants, whose testimony the jury chose to accept, these are the essential facts: Some time previously local authorities had issued five felony warrants for the arrest of Tyrone on charges of burglary, in the City of St. Louis; resisting arrest, St. Louis County; burglary and stealing, in Kinloch; resisting arrest, in Kinloch, and armed robbery with a dangerous and deadly weapon. Defendants, operating a police car, encountered Tyrone and his 16-year-old friend Walter West, at 2:30 or 3 o'clock in the morning at the intersection of Martin Luther King Street and Wesley Street in Kinloch. Officer Moore exited the police car on the passenger side and told Tyrone he was under arrest. Tyrone moved toward the driver's side of the vehicle. Officer Simpson, the driver, stepped out of the police car. Tyrone had his right hand in his right front pocket. Moore told him to take his hand out of his pocket. Tyrone turned his back toward Moore and "made a motion as if to do something with whatever he had in his right front pocket." Moore advised Tyrone "not to do it," whereupon Tyrone began to run north along Martin Luther King Street. When Tyrone was 10 feet distant Moore fired a warning shot in the air, after yelling "Halt!" When Tyrone was 20–30 feet distant Moore took a low aim at Tyrone and fired twice. Moore denied that he was trying to kill Tyrone. He testified he was trying to prevent the subject from escaping. Simpson, at the same time and from the same position as Moore, fired once at Tyrone. Shot in hip, lung and heart, Tyrone turned into a vacant lot, where he died.

During the month preceding this occurrence Moore was called to an intersection in Kinloch where two other officers had arrested Tyrone. When he arrived Moore informed Tyrone that he was under arrest for numerous felony warrants active at that time. Tyrone responded, "You will have to kill me before you arrest me," and then began to run. Moore ran after him but was unable to catch him. Moore did not fire any shots on that occasion. The next day Moore went to Tyrone's residence, where he spoke to Tyrone's father, telling him that Tyrone was wanted by Kinloch Police Department and numerous other departments for various felony offenses; that Tyrone had run away from Moore on the preceding day, and that if Tyrone continued running from police officers "he may be shot."

Defendants' main verdict-directing Instruction No. 5 follows:

"Your verdict must be for defendants, if you believe:

"First, that Leander Moore and Lloyd Simpson were duly appointed and authorized police officers of the City of Kinloch, and

"Second, that Lemandris Tyrone Davis was on the morning of September 23, 1972 wanted for the commission of one or more acts for which felony warrants were pending, and

"Third, that the officers met and attempted to arrest Lemandris Tyrone Davis on the morning of September 23, 1972, and told him of their intention to do so, and

"Fourth, that Lemandris Tyrone Davis did then flee from Officers Moore and Simpson, and

"Fifth, that officers Moore and Simpson used the necessary means to effect the arrest."

Instructions Nos. 9, 10 and 11 told the jury that the officers "had a duty to arrest persons whom they had reasonable cause to believe guilty of a felony and to use such force as they may reasonably believe to be necessary to accomplish the arrest"; that "the presumption is that peace officers are in the lawful discharge of their duty in attempting to make arrests," and that "a police officer may use all necessary means to effect an arrest after giving notice of the intention to make the arrest."

1. "If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest."

The terms "necessary means" and "all necessary means" to effect an arrest, and "such force as they may reasonably believe to be necessary," were not further defined in any other instruction.

Appellants claim Instruction No. 5 is erroneous because it did not define the use of the term "necessary means to effect the arrest"; that this language is extraordinarily general and indefinite; that its legal import should be explained or defined; that "the failure to do so impinges upon the law-giving function of the court and leaves to the jury a roving commission to reach decisions in darkness of established precepts controlling claims or defenses placed before them." Specifically, appellants assert that in this context the word "necessary," a variable term, should be applied in a strict and literal sense; that "necessary means" should be understood as the "sole means" or the "indispensable means" of effecting an arrest. Appellants point out that in *Walsh v. Oehlert*, 508 S.W.2d 222, 224 (Mo.App. 1974), this court declared the common law and Missouri law to authorize a police officer to use deadly force to apprehend an accused fleeing felon "as a last resort." They cite The American Law Institute Restatement of Torts (2d) § 131(c) (1965) statement that existing law prohibits the use of deadly force unless "the actor reasonably believes that the arrest cannot otherwise be effected," and that the use of force involving serious danger is privileged "only as a last resort when it reasonably appears to the actor that there is no other alternative except abandoning his attempts to make the arrest." They contend that the use of force likely to take human life is recognized as necessary or excusable only when it is the sole, or indispensable means of arrest—the last resort—a last ditch measure without which the arrest could never be made, at any time or place, within the realm of reasonable probability and belief; that the jury should have been given a chance to consider the opportunity for a deferred arrest of Tyrone, who had lived in the small community of Kinloch all his life, and whose identity and place of residence were known to the police, by a proper in-struction encompassing the element of last resort.

■ In instructing juries the general rule is that where the law is embodied in a statute it is sufficient to follow the language of the statute. There are situations, however, in which because of the generality of the terms of a statute, the peculiarity of its wording, or the use of technical terms it is liable to be misunderstood by a jury and cannot be administered without an added explanation. In such case it is not sufficient in declaring the law merely to follow the precise terms of the statute, without adding the explanation of those terms which an authoritative court has affixed to its terms. *State ex rel. Little v. Donnelly,* 9 Mo.App. 519 (1881), cited by appellants.

■ This is not such a situation. The words "necessary means" or "all necessary means" to effect an arrest have a common and well-understood meaning when considered in connection with a given factual situation. Because of the infinite number of different factual circumstances which may arise it is hardly possible to define these terms more precisely and yet give them universal application. They are non-technical terms; they are not words of art. In their ready understandability in a given factual milieu they are comparable with the following terms, which courts have ruled useable in instructions without further definition: "brought on the difficulty," *State v. Bailey,* 190 Mo. 257, 88 S.W. 733 (1905); "improper conduct," *State v. Barrington,* 198 Mo. 23, 95 S.W. 235 (1906); "material facts," *State v. Davidson,* 172 Mo.App. 356, 157 S.W. 890 (1913); "heat of passion," *State v. Gore,* 292 Mo. 173, 237 S.W. 993 (1922); "reasonable provocation," *State v. Glenn,* 262 S.W. 1030 (Mo.1924); "apprehended danger," *State v. Howard,* 352 Mo. 410, 177 S.W.2d 616 (1944); "reasonable cause," idem; "unlawful provocation," *State v. Graves,* 352 Mo. 1102, 182 S.W.2d 46 (1944); "adequate warning," *Kinder v. Pursley,* 488 S.W.2d 937 (Mo.App.1972). As noted in *Kinder v. Pursley,* supra, the terms "excessive speed," "careful lookout," "fol-

lowing too closely," "adequate and timely warning," "position of immediate danger," etc., are not required to be defined in MAI instructions. If we accede to appellant's request and require that the "last resort" concept be added to the language of the statute the next step will be a request to define the term "last resort."

Both from the standpoint of the policeman on line duty who "in the first instance is the judge of the manner and means to be taken in making an arrest," *Manson v. Wabash R. Co.*, 338 S.W.2d 54, 61[17] (Mo. banc 1960), and from that of the ultimate trier of the facts applying common sense in judging the propriety of the means taken, it is better that the common, everyday wording of the statute ("all necessary means") be left without further definition, flexible and adaptable to the factual situation presented.

■ Appellants' second point is that Instruction No. 10 ("[T]he presumption is that peace officers are in the lawful discharge of their duty in attempting to make arrests") is "an erroneous application of a rule of procedural practicality used here to relieve defendants of their burden of proof on their affirmative defense." Appellants point out that Instruction No. 2 told the jury that the burden is upon defendants to cause the jury to believe the propositions necessary to support their defense that defendants used necessary force, and they argue that "a presumption of legality of the arrest conduct is completely at odds with the affirmative duty defendants had under law to furnish the proof on their 'necessary means' defense."

"[T]he presumption is that peace officers are in the lawful discharge of their duty in attempting to make arrests." *State v. Nolan,* 354 Mo. 980, 192 S.W.2d 1016, 1021[11] (1946). In *State v. Nolan* the officers were not attempting to make an arrest based upon an arrest warrant but on reasonable cause to believe that the fleeing person had committed a felony. Here defendants had five unexecuted and outstanding warrants for the arrest of Tyrone, based upon felony charges. This raised more than a presump-

tion of regularity in initiating Tyrone's arrest; these officers were under a clear duty as a matter of law to attempt the arrest.

Appellants misinterpret the quotation from *State v. Nolan,* embodied in Instruction No. 10, as a direction to the jury that defendants' conduct at the time Tyrone was killed is presumed to have been lawful. Such a direction would, as claimed, conflict with defendants' burden to establish their affirmative defense, but Instruction No. 10 does not direct the jury that the shooting and killing of Tyrone is presumed to have been in the lawful discharge of duty, and it may not fairly be so interpreted. It merely tells the jury that in undertaking an arrest—in initiating action to effect an arrest—police officers are presumed to be in the lawful discharge of official duty. Instruction No. 10 relates to the lawfulness of the *initiation* of the arrest procedure by the officers. It does not relate to what happened during the course of the arrest. Under Instruction No. 2 the defending officers had the burden of sustaining their defense that they used necessary force—the necessary means to effect the arrest—a burden undiminished by Instruction No. 10. There was no error in giving Instruction No. 10.

■ Appellants' third point: "Defendants' counsel should not have been permitted to call and interrogate plaintiff-father concerning arrests of his decedent of which there had been no evidence." To place this point in the proper setting we revert to Davis' first appearance on the stand, testifying in his case in chief. On cross-examination Davis testified that his son Tyrone had been in trouble in one or two minor cases, but nothing serious. Defendants' counsel then asked if he knew Tyrone was wanted on a charge of stealing; was charged with assault of a police officer in Kinloch; was wanted for burglary in the City of St. Louis; was wanted by Kinloch police for suspicion of armed robbery; was out on a $10,000 bond for robbery by means of a dangerous and deadly weapon; was charged with assault with intent to kill, and that on May 12, 1971 Tyrone had pled guilty to resisting arrest. Davis denied having

knowledge of the foregoing. Thereafter, at the conclusion of defendants' case in chief, as the trial was drawing to a close, defendants' counsel recalled Davis to the stand and asked him whether he knew that

(1) on October 8, 1970 his son had been arrested for attempted burglary, till tapping and destruction of private property;

(2) on the same date he was arrested as a fugitive from the St. Ann Police Department;

(3) on October 9, 1970 Tyrone was arrested by the Kinloch Police Department and charged with being "a fugitive from Kinloch, suspicion of assault with intent to kill;

(4) on October 10, 1970 Tyrone was arrested by the Kinloch Police Department, charged with robbery in the first degree by means of a dangerous and deadly weapon;

(5) on November 11, 1970 Tyrone was arrested, charged with resisting arrest and flight;

(6) on November 29, 1970 Tyrone was arrested as a fugitive by Kinloch Police Department, for suspicion of arson and breaking and entering;

(7) on October 15, 1969 Tyrone was arrested as a fugitive from Velda Village;

(8) on December 2, 1970 Tyrone was arrested by Kinloch Police Department, charged with robbery by means of a dangerous and deadly weapon.

Davis recalled three of the eight arrests. Asked whether he considered first degree burglary a minor offense he said he would. Asked whether he considered robbery by means of a dangerous and deadly weapon a minor offense he answered that he called it that "but it wasn't minor." Counsel concluded recross-examination by asking three questions to which objections were sustained: whether Davis was not telling the truth when he told the jury Tyrone had only been involved in minor offenses; whether he failed to tell the jury the truth about anything else, and whether he lied about anything else.

The questions concerning his knowledge of the eight arrests were asked and answers required over objections that there was no evidence on these matters; that it was highly prejudicial and inflammatory to inquire about them; that the inquiries were irrelevant to the issue and prejudicial.

At the conclusion of recross-examination defendants' counsel had marked for identification an exhibit purporting to be a certified copy of the arrest record of Tyrone Davis (Exhibit E), and offered it in evidence without producing the custodian of the record to identify it. On objection on the ground of hearsay Exhibit E was not received in evidence, the court reserving its ruling on the offer. Later counsel for defendants stated he had sent for Mrs. Dodd, custodian of the records, but the trial was concluded without her appearing and testifying and without any ruling on the admissibility of Exhibit E. Accordingly, there was no evidence that the alleged arrests were actually made. Nevertheless, counsel for defendants repeatedly phrased his questions so as to assume that in fact the arrests were made. "It is, of course, improper and sometimes prejudicial to phrase questions on cross-examination * * * so as to assume as fact matters of which there is no evidence, *Lonnecker v. Borris,* Mo., 245 S.W.2d 53, 56[3, 4]; *State v. Carroll,* Mo., 188 S.W.2d 22, 24; III Wigmore, Evidence, § 780, pp. 135–137 (3rd ed. 1940), and a new trial may be granted for persistent interrogation by improper questions when significant and improper inferences are created. *Ryan v. Campbell '66' Express,* Mo., 304 S.W.2d 825, 828; *Moore v. Shelly Motors, Inc.,* Mo.App., 225 S.W.2d 953; Anno., 109 A.L.R. 1089 (1937)." *Hawley v. Merritt,* 452 S.W.2d 604, 610 (Mo.App.1970). The plain inference to be drawn from continually recounting Tyrone's supposed arrests on numerous occasions, on serious criminal charges, implying that he was a chronic offender constantly in the toils of the law and a fugitive from justice, was that Tyrone was an unworthy person who got what he deserved.

Furthermore, the several supposed arrests were matters collateral to the issues in dispute. There was no issue as to these

arrests, which were entirely irrelevant and immaterial to the question whether defendants used the necessary means to effect the arrest of Tyrone. The trial court should have sustained the numerous objections to the questions relating to the eight arrests. Additionally, having cross-examined Davis on collateral matters defendants were bound by the answers given by him, 29A Mo. Digest Witnesses ⊕405(1), and should not have been permitted to further pursue the subject on recross-examination, or offer evidence to contradict Davis' answers. *Wiesemann v. Pavlat*, 413 S.W.2d 23 (Mo. App.1967).

The issue framed by the pleadings put defendants on trial. The way the case was tried, however, the tables were turned and deceased and his father were effectively placed on trial. To justify their arrest of Tyrone defendants relied upon the existence of five outstanding unexecuted warrants for his arrest on five felony charges. The proper, recognized method of making proof and the best evidence would have been to subpoena the warrants and their custodian and introduce the warrants in evidence. Instead of pursuing this conventional method of proving this fact defendants subpoenaed three of the victims of the crimes, and to the great prejudice of plaintiffs placed the victims on the stand and had them testify in detail concerning the facts and circumstances surrounding the crimes, and introduced oral testimony that arrest warrants were issued on these five charges. Then, with a background of extensive original cross-examination of Davis with respect to arrests, defendants' counsel recalled him at the end of the trial, immediately before the instructions were read to the jury, and paraded before the jury the litany of unproved arrests above enumerated.

The real issue in the case—whether defendants used the necessary means to effect the arrest or used unnecessary force—was thus obscured and de-emphasized; deceased and his father were placed on trial in place of defendants. Plaintiffs were thereby prejudiced in the presentation of their case and effectively deprived of a fair trial.

Other alleged errors in empanelling the jury and in defendants' closing argument need not be considered in view of the occurrence of reversible error in the recross-examination of Tommy Lee Davis. On retrial these other incidents will not likely reoccur.

Reversed and remanded for a new trial.

SIMEONE, C. J., concurs in separate opinion.

STOCKARD, Special Judge, Concurs.

SIMEONE, Chief Judge, concurring.

I concur that this cause must be reversed and remanded for a new trial but add a few comments concerning what this case does and does not hold. The parties did not raise, nor does the opinion deal with, the constitutionality of § 544.190, RSMo 1969, *Mattis v. Schnarr*, 547 F.2d 1007 (8th Cir. 1976), judgment vacated, *Ashcroft v. Mattis*, —— U.S. ——, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). Nor does the opinion deal with the complex problem of the use of deadly force by police officers in effecting an arrest for a felony, A Model Code of Pre-arraignment Procedure, § 120.7 (1975); S.B. 60, The Criminal Code of Missouri, effective January 1, 1979, § 563.046. The opinion only deals with trial errors of parading before the jury the "litany of unproved arrests . . . ." For the reasons explained in the opinion by Houser, Sp. J., on that issue I concur. Other matters not raised or determined by the original opinion must await another day.